**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**BALTIMORE DIVISION**

| | |
|---|---|
| SHARYL THOMPSON ATTKISSON,<br>JAMES HOWARD ATTKISSON,<br>SARAH JUDITH STARR ATTKISSON,<br><br>      Plaintiffs,<br><br>v.<br><br>ROD ROSENSTEIN, SHAWN HENRY,<br>SEAN WESLEY BRIDGES, ROBERT<br>CLARKE, RYAN WHITE and UNKNOWN<br>NAMED AGENTS OF THE DEPARTMENT<br>OF JUSTICE, in their individual capacities,<br><br>      Defendants. | Civil Action No. 1:20-cv-68<br>Hon. Richard D. Bennett |

---

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION
TO DISMISS OF DEFENDANTS ROSENSTEIN AND HENRY**

---

## INTRODUCTION

Plaintiff Sharyl Attkisson, an award-winning journalist—along with her husband and child—have tried for years to pursue their significant and credible claims of illegal government surveillance, but the U.S. Government has stonewalled them at every turn. Yet, despite the Government's repeated efforts to obfuscate and delay, the Attkissons detailed in their Complaint:

- Expert forensic computer analysis of the Attkissons' computers, revealing that an unauthorized entity or entities gained remote access to the Attkissons' computers for a prolonged period, and that one of the pathways by which the intrusions occurred were IP addresses controlled by the U.S. Government.

- Confirmation, via testimony, that the U.S. Government controlled the IP addresses identified in the Attkissons' computers.

- The degree to which senior figures in the Department of Justice were concerned about, and took steps to block, Sharyl Attkisson's reporting, as well as her use of confidential governmental sources;

- Many documented instances of abnormal, otherwise unexplained behavior of the Attkissons' computer systems and devices.

Nevertheless, despite these factual allegations, the Attkissons have been stymied because the Government has blocked their every effort to identify the names of *specific Government agents* who were directly involved in the unlawful surveillance of their computers. And the Government has created so many and varied obstacles to litigation that the Attkissons have been prevented from conducting meaningful discovery in order to identify these Government agents. Thus, the

Government entity that is supposed to hold the responsible parties accountable is instead shielding them and controlling the information the Attkissons need to identify them. Ultimately, the Fourth Circuit—while expressing astonishment that the Government lawyers arguing the case refused even to represent the John Doe defendants, Oral Argument at 21:26-24:02, *Attkisson v. Holder*, 925 F.3d 606 (4th Cir. 2019) (No. 18-677)—was forced to dismiss as to those defendants without prejudice *to refile when those defendants could be identified*. *Attkisson,* 925 F.3d at 628.

**That day has now arrived.**

Plaintiffs' investigator has interviewed Ryan White, a Government whistleblower (and named Defendant). During this interview, White made the following significant assertions:

- White worked with defendants Sean Bridges (then a Secret Service agent) and the FBI's Shawn Henry in Baltimore, reporting directly to defendant Rod Rosenstein.

- White and Agent Bridges were ordered to conduct various clandestine operations involving hacking computer systems, servers, emails, and phones.

- White and Agent Bridges were directly involved in the illegal surveillance of the Attkissons' computers and the exfiltration of data.

- The rogue order to target the Attkissons came directly from Agent Henry and Rosenstein.

- Later, Agent Bridges and another federal agent were convicted of corrupt acts for their involvement in the Government's notorious Silk Road Task Force, also based in Baltimore, in which corruption by federal agents was uncovered, resulting in the convictions of Bridges and another federal agent.

This information—to be further developed during discovery—places the Government's repeated stonewalling of this case in a new and more nefarious light. It now appears that the Government has been using procedural obstacles and motions to deliberately obfuscate and run out the clock on this litigation despite the merits of the claims. The Government's new 12(b) motion, throwing up a laundry list of procedural objections—some bordering on the frivolous—must be viewed in this context.

This memorandum addresses each of the Government's objections in turn. But the bottom line is that the Attkissons now can identify at least some of the previously unnamed federal agents. Moreover, they have obtained detailed whistleblower testimony to accompany their substantial forensic evidence to support their claims. Thus, the Government must not be allowed to block the Attkissons' claims yet again. These claims clearly deserve full discovery and a trial in order to finally address the merits of these claims once and for all.

I.      **Issue Preclusion Does Not Bar the Attkissons' *Bivens* Claim Because the Fourth Circuit's Ruling Explicitly Did Not Address the John Doe Defendants.**

Issue preclusion, or collateral estoppel, bars the relitigation of legal or factual issues previously litigated, actually determined, and necessarily decided in a prior case. *Sedlack v. Braswell Services Group, Inc.*, 134 F.3d 219, 224 (4th Cir. 1998) (citation omitted). However, in applying the doctrine courts must above all protect litigants' right to a full and fair opportunity to litigate their claims. *See Poku v. FDIC*, No. RBD-08-1198, 2011 WL 334680 at *7–8 (D. Md. Jan. 31, 2011) (citing *Ritter v. St. Mary's College*, 814 F.2d 986, 994 (4th Cir. 1987)).

A party seeking to assert issue preclusion must establish that the issue to be precluded is identical to the one previously litigated. "[C]hanges in facts essential to the first judgment will

3

render collateral estoppel inapplicable in a subsequent action raising the same issues." *Montana v. United States*, 440 U.S. 147, 159 (1979). New factual allegations raised in a present suit that were not alleged in prior litigation could not have been actually determined by a previous court. *See Hately v. Watts*, 917 F.3d 770, 780 (4th Cir. 2019) (holding that a plaintiff's claims, dismissed without prejudice for failing to allege specific injuries, could not be estopped when he refiled with new and specific allegations because the prior court "did not have an opportunity to pass judgment on the sufficiency of the factual allegations at issue in the present case.").

In the Fourth Circuit, the Attkissons made two separate legal arguments regarding the viability of their Fourth Amendment claim brought pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). First, they argued that the U.S. Supreme Court's decision in *Ziglar v. Abassi*, 137 S. Ct. 1843 (2017), did not prevent a *Bivens* claim against defendants Eric Holder and Patrick Donahoe. Second, they argued that, "even if this Court were to decide that the claims against Holder and Donahoe are an extension of *Bivens* and thus blocked by *Ziglar*, the claims against the John Does should still proceed." Brief of Appellants at 30 n.4, *Attkisson v. Holder*, 925 F.3d 606 (4th Cir. 2019) (No. 18-1677).

The Fourth Circuit only actually decided and necessarily determined that dismissal of a *Bivens* remedy pursuant to *Ziglar* was proper "*with respect to Holder and Donahoe*." 925 F.3d at 622 (emphasis added).[1]  Whether a plausible Fourth Amendment claim exists against the John Doe defendants, however, remained unresolved and open to further factfinding. *Id*. at 628..

---

[1]   Indeed, the Fourth Circuit opinion refers specifically and exclusively to the *Bivens* claim *against Holder and Donahoe* no less than seven times over the course of its two-page discussion of the issue. *Attkisson v. Holder*, 925 F.3d 606, 620–22 (4th Cir. 2019).

4

While the Attkissons still believe the Fourth Circuit erred in its application of *Ziglar* to bar the claims against Holder and Donahoe, they are not asking this Court to address that ruling or to relitigate it. Instead, they are asking this Court to address the issue that the Fourth Circuit explicitly did *not* rule on: the viability of a *Bivens* Fourth Amendment claim against the John Doe defendants who were directly involved in the infiltration of the Attkissons' computers.

As discussed in more detail below, the issue of whether *Ziglar* forecloses a suit against these newly identified Government agents who were directly involved in an unlawful search is a very different question from the one the Fourth Circuit previously addressed. Holder and Donahoe were heads of Government agencies and therefore could be thought to be making larger policy choices of the sort that *Ziglar* sought to protect. In contrast, the direct acts of Government agents to carry out an unlawful clandestine operation to infiltrate the Attkissons' computer systems implicate no overarching policy determinations at all.

Because the *Bivens/Ziglar* analysis is highly fact-specific, "any changes in facts essential to the judgment" renders the Fourth Amendment issue not identical to the one previously litigated. *Montana*, 440 U.S. at 159. For example, in *Tuttle v. Arlington County Sch. Bd.*, 195 F.3d 698, 704 (4th Cir. 1999), *cert. dismissed*, 529 U.S. 1050 (2000), an earlier suit had enjoined the School Board from implementing its admissions program, in part because diversity was deemed not to be a compelling government interest. 195 F.3d at 704. Yet, the court permitted the School Board to re-raise this issue in a subsequent case concerning a new admissions policy. *Id*. As the court recognized, because the underlying admissions policy was different from the original policy, the issue was "hardly identical" to the issue decided in the previous case. *Id*.

5

Likewise here, any determination regarding whether a *Bivens* claim is cognizable against *two agency heads* is irrelevant to the issue now raised in this case: whether a *Bivens* claim is cognizable against *lower-level Government agents* who were directly involved in committing the unlawful search. Indeed, the Fourth Circuit holding rested on two grounds not present here. The panel majority specifically stated that the claim before it presented a "new *Bivens* context" because "Holder and Donahoe held much higher ranks than the line-level FBI agents sued in *Bivens*" and because "the plaintiffs seek to hold high-level officials accountable for . . . policy-level decisions." *Attkisson v. Holder*, 925 F.3d 606, 621 (4th Cir. 2019). Such a discussion surely cannot be issue preclusive with regard to the sorts of defendants named here.[2]

## II. The Attkissons' *Bivens* Claim Is Cognizable Because They Are Suing Only the Particular Government Agents Who Conducted the Unlawful Search and None of the Factors Animating *Ziglar v. Abassi* Is Present Here.

The Attkissons' claim that the Government Defendants violated the Fourth Amendment of the U.S. Constitution is simply *Bivens* for the digital era. In *Bivens* the complaint alleged that a group of unidentified FBI agents, acting under claim of federal authority, entered an apartment and conducted a warrantless search without probable cause. *Bivens*, 403 U.S. at 389. The U.S.

---

[2]   Although the Fourth Circuit provided additional grounds for applying *Ziglar* to block the Attkissons' *Bivens* claim against Holder and Donahoe, 925 F.3d at 621, that discussion also cannot provide the basis for issue preclusion in this case. Because the Fourth Circuit discussed those grounds while applying *Ziglar*'s multi-factor test, it is impossible to tell whether any one factor, standing alone, would have been enough to block the claim. Accordingly, no single finding can be deemed essential to the judgment. *See, e.g. In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 327-28 (4th Cir. 2004) ("[W]hen issue preclusion is considered in the context of two separate litigations, … if a judgment in the prior case is supported by either of two findings, neither finding can be found essential to the judgment."); *see also Hately*, 917 F.3d at 779–80 (4th Cir. 2019) (barring application of issue preclusion when the district court left open at least two possibilities as to the reason for its prior dismissal).

Supreme Court allowed the plaintiff to recover damages from the responsible federal officials, holding that the Fourth Amendment "guarantees to citizens of the United States the absolute right to be free from unreasonable searches and seizures carried out by virtue of federal authority" and that monetary damages may be obtained for violations of that guarantee. *Id.* at 392.

The Attkissons' Complaint is fundamentally identical. Here, the Attkissons contend that a group of federal agents, likewise acting under federal authority, entered their computer systems through electronic means and conducted warrantless surveillance in violation of the Fourth Amendment. Accordingly, the claim here is just as serious as in *Bivens*, if not more so, and it fits squarely within the *Bivens* framework, breaking no new legal ground. Thus, there is no reason not to allow the Attkissons' claim to at least move forward to the discovery phase.

In *Ziglar* the U.S. Supreme Court made it absolutely clear that *Bivens* and cases like it remain good law and that complaints raising individual *Bivens*-like claims for monetary damages remain cognizable. Indeed, it is difficult to imagine how the Court could have been more explicit that *Bivens* remains good law. The Court tackled the question head-on, stating firmly that "this opinion is not intended to cast doubt on the continued force, or even the necessity, of *Bivens* in the search-and-seizure context in which it arose." *Ziglar*, 137 S. Ct. at 1856.

Thus, although *Ziglar* resisted efforts to *extend* the *Bivens* remedy beyond its core contexts, there can be no doubt that monetary claims against "individual officers for their alleged 'overreach,' in effectuating a 'standard law enforcement operation'" remain available. *Jacobs v. Alam*, 915 F.3d 1028, 1038 (6th Cir. 2019) (quoting *Ziglar*, 127 S. Ct. at 1861–62). Moreover, the *Ziglar* Court made clear that particularly in claims involving searches and seizures, *Bivens*

7

provides useful "instruction and guidance to federal law enforcement officers." *Ziglar*, 137 S. Ct. at 1857. Indeed, given the sheer number of searches that law enforcement authorities conduct, such guidance—and a remedy for overreach—are essential.

A *Bivens* remedy for unlawful searches has become even more important in an era of electronic surveillance. Certainly, if part of the purpose of *Bivens* is to provide "instruction and guidance to federal law enforcement officers," *id.*, such instruction and guidance is especially needed as those authorities have amassed radically expanded toolkits for conducting remote searches through electronic means.[3] Thus, a claim such as the one raised by the Attkissons is a necessary, fact-bound application of *Bivens* that effectuates Fourth Amendment values in the digital arena.

Although *Ziglar* disfavors *extending Bivens* claims to novel contexts, the Attkissons' claims do not raise the sorts of concerns the *Ziglar* Court identified. In particular, the Court denied the heart of the plaintiff's claim in *Ziglar* because, in three fundamental ways—none of which applies here—the *Ziglar* complaint would have impermissibly extended *Bivens*.

First, the complaint in *Ziglar* was not a suit brought by a single individual regarding a single incident, as in *Bivens*. Instead, it was a massive challenge to U.S. detention policy on behalf of hundreds of inmates. Because of the sheer scale of the complaint, the Court worried that "the discovery and litigation process would either border upon or directly implicate the discussion and

---

[3]   For that reason, there is certainly no basis for refusing to allow *Bivens* suits just because the government search is electronic rather than physical. *Cf, e.g.*, *Gustafson v. Adkins*, 803 F.3d 883, 886 (7th Cir. 2015) (permitting *Bivens* action to proceed in a case alleging that Government's installation of covert video surveillance equipment constituted an unconstitutional search).

deliberations that led to the formation of the policy in question." 137 S. Ct. at 1860–61. According to the Court, allowing such a suit "would require courts to interfere in an intrusive way with sensitive functions of the Executive Branch." *Id.* at 1861.

Second, the complaint in *Ziglar* implicated core national security policies instituted at the highest levels of the U.S. Executive Branch after the terrorist attacks on September 11, 2001. *Id.* at 1860. As the *Ziglar* Court made clear, "respondents' detention policy claims challenge the confinement conditions imposed on illegal aliens pursuant to a high-level executive policy created in the wake of a major terrorist attack on American soil." *Id.* Thus, allowing a *Bivens* claim challenging these policies would necessarily involve the judiciary in a review of fundamental discretionary U.S. Executive Branch national security decisions. Given the significant separation-of-powers concerns that a *Bivens* action would create in this context, the *Ziglar* Court refrained from expanding *Bivens* in such a broad review of detention policy. As the Court stated, the complaint challenges "major elements of the Government's whole response to the September 11 attacks, thus of necessity requiring an inquiry into sensitive issues of national security." *Id.* at 1861.

Third, the *Ziglar* complaint sought broad-based institutional reform through an injunction that would change U.S. detention policy. In contrast, *Bivens* had sought only monetary damages on behalf of one individual to remedy a clearly defined violation of an established right.

The Fourth Circuit interpreted *Ziglar* for the first time in *Attkisson v. Holder*, 925 F.3d 606, 621 (4th Cir. 2019). However, as discussed above, that decision addressed only the claims brought against heads of federal agencies based on policy decisions that they made. The court did *not* address how it would apply *Ziglar* to the potential claims against the John Doe defendants. Thus,

the *Attkisson* decision provides no guidance in this suit.

In applying *Ziglar* to claims by lower-level Government officials, the approach of both the Sixth and Ninth Circuits is instructive. In *Jacobs v. Alam*, 915 F.3d 1028, 1038 (6th Cir. 2019), the Sixth Circuit ruled that *Ziglar* does not block "run-of-the-mill challenges to 'standard law enforcement operations' that fall well within *Bivens* itself." Accordingly, because plaintiff's claims were not "overarching challenges to federal policy in claims brought against top executives, but…claims against three individual officers for their alleged 'overreach,'" they were cognizable under *Ziglar*. *Id.* at 1038 (quoting *Ziglar*, 137 S. Ct. at 1862). Similarly, in *Lanuza v. Love*, 899 F.3d 1019, 1028–30 (9th Cir. 2018), the Ninth Circuit allowed a *Bivens* claim to proceed precisely because the claim at issue was not against high-level officials for discretionary policy decisions they may have made, but was instead brought against an individual official for his own allegedly unconstitutional actions. In addition, the claim did not seek to change Government policy in any way, unlike in *Ziglar*. Accordingly, the court ruled that the *Bivens* claim was available.

Likewise, at least some lower courts applying *Ziglar* have drawn precisely the distinctions described above. Thus, discrete violations of clearly established rights that have previously been recognized as cognizable *Bivens* claims can still proceed, while broad claims seeking new changes to Executive Branch policy cannot. For example, in *McLean v. Gutierrez*, an Eighth Amendment excessive force claim could proceed because it challenged "a single instance of misconduct rather than any high level policies." No. ED CV 15–275 –RGK (SP), 2017 WL 6887309, at *18-19 (C.D. Cal. Sept. 28, 2017). As the judge noted, quoting *Ziglar*, "[i]ndividual instances of misconduct 'due to their very nature are difficult to address except by way of damages actions after the fact.'"

10

*Id.* at \*19 (quoting *Ziglar*, 137 S. Ct. at 1862). Because the case presented "a relatively simple question of whether a federal official applied excessive force during his pat-down search against plaintiff," that claim could proceed. *Id.* Similarly, in *Jerra v. United States*, which also raised an excessive force claim against prison guards, the district court recognized that *Ziglar* should not foreclose the *Bivens* claim. No. 2:12–cv–01907–ODW, 2018 WL 1605563, at \*6 (C.D. Cal. Mar. 29, 2018), *appeal dismissed per stipulation sub nom. Jerra v. Magana*, No. 18-55678, 2019 WL 2273662 (9th Cir. Feb. 13, 2019). The court observed that the claims at issue "involve[d] two individual officers, and their individual actions—not large-scale government policies." *Id.* The claims also did "not implicate national security, executive policy, or the other largely political concerns addressed in *Ziglar*." *Id.* Finally, the claims asked for damages, rather than an injunction, again distinguishing the case at issue from *Ziglar*. *Jerra*, 2018 WL 1605563, at \*5.[4]

As with these cases, the Attkissons' claim implicates no U.S. Executive Branch policy at

---

[4]   Post-*Ziglar* federal appellate cases refusing to permit a *Bivens* suit to proceed are all easily distinguishable from the Attkissons' claims. For example, the U.S. Supreme Court declined to extend *Bivens* to a suit brought by a Mexican citizen for an injury on Mexican soil. *See Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017). The Fourth Circuit declined to extend *Bivens* to a claim brought against U.S. military officials operating under special regulations at a Naval installation in Bahrain, also a very different context. *See Doe v. Meron*, 929 F.3d 153, 169 (4th Cir. 2019). The Third Circuit declined to extend *Bivens* to a First Amendment claim against the Transportation Security Administration ("TSA") because airport security implicates "split-second" national security decisions and because Congress had limited the scope of judicial review over TSA decisions. *See Vanderklok v. United States*, 868 F.3d 189, 207–08 (3d Cir. 2017). The Second Circuit declined to extend *Bivens* to an Equal Protection Clause claim brought by a military cadet because *Bivens* claims are especially disfavored within the military context. *See Doe v. Hagenbeck*, 870 F.3d 36, 43–44 (2d Cir. 2017). And other appellate courts have declined to extend *Bivens* to other non-Fourth Amendment contexts. *See Liff v. Office of Inspector Gen. for U.S. Dep't of Labor*, 881 F.3d 912, 919 (D.D.C. 2018); *González v. Vélez*, 864 F.3d 45, 53–54 (1st Cir. 2017). None of these decisions is apposite and none arises in the context of a government search of a private U.S. citizen, which, like the Attkissons' claim, is the precise scenario in *Bivens* itself.

11

all. Instead, the Attkissons challenge an individual instance of governmental overreach committed by a small number of federal officials. Certainly, if Government officials infiltrated the Attkissons' computer systems without a warrant or exigent circumstances, then a clear Fourth Amendment violation took place. A successful *Bivens* action would in no way involve the judiciary in second-guessing large U.S. Executive Branch policies as the *Ziglar* case would have.

In addition, the Attkissons' Complaint does not challenge broad issues of U.S. national security policy, as *Ziglar* did. Indeed, it is important to recognize that this is *not* a case challenging the Government's overall policy of trying to identify or prosecute those who leak confidential governmental information. Such a claim, were it at issue, might well run afoul of *Ziglar*'s separation-of-powers concerns by entangling the judiciary in a suit aiming to litigate a large-scale discretionary policy decision. Instead, the Attkissons' sole concern is the specific infiltration of their computer systems to conduct warrantless surveillance. That infiltration, unless somehow justified, is simply an unconstitutional search; no broad policy question need be resolved, and no large-scale national security question is at stake.

Finally, the Attkissons, like the plaintiff in *Bivens*, seek monetary damages. Thus, this is not an institutional reform case like *Ziglar* that asks for a broad change in U.S. Executive Branch policy going forward. It simply asks for compensation for a specific governmental violation of clearly established Fourth Amendment rights.

As noted above, the Fourth Circuit in its decision in *Attkisson v. Holder*, 925 F.3d 606 (4th Cir. 2019), relied heavily on the fact that the Attkissons' Complaint in that case named Holder and Donahoe, who were agency heads, rather than the lower-level FBI agents who were the defendants

in *Bivens* itself. 925 F.3d at 621. Here, unlike in *Attkisson v. Holder*, the defendants are not officials laying out policy goals; they are only those who actually ordered and conducted the infiltration of the Attkissons' computer systems or the resulting surveillance activity.[5]

The Fourth Circuit in *Attkisson* also relied in part on the possible existence of other statutory remedies as a reason not to permit the Attkissons' *Bivens* claim to proceed against Holder and Donahoe. 925 F.3d at 621–22. And while it is true that *Ziglar* noted that those plaintiffs might have other avenues to address their detention claims, here, the only likely alternative statutory claims are under the Electronic Communications Privacy Act ("ECPA") or the Federal Tort Claims Act ("FTCA"). As to the ECPA claims, the Government is asking this Court to dismiss the Attkissons' ECPA claims as well, so it is disingenuous to say that the ECPA provides a viable alternative. As to the FTCA claims, the U.S. Supreme Court has explicitly rejected the idea that the FTCA constitutes a viable substitute for *Bivens*. In *Carlson v. Green*, the Court held that "the *Bivens* remedy, being recoverable against individuals, is a more effective deterrent than the FTCA remedy against the United States." 446 U.S. 14, 15 (1980). The Court also noted that it was "'crystal clear' that Congress intended the FTCA and *Bivens* to serve as 'parallel' and

---

[5]   The Government's effort, Defs. Mot. Dismiss 7, to pretend that defendants Rosenstein and Bridges qualify as the sort of high-ranking officials contemplated in *Ziglar* is laughable. In *Ziglar*, the plaintiffs were suing the former Attorney General, former FBI Director, and former Immigration and Naturalization Service Commissioner for large-scale antiterrorism policies they had adopted with regard to entire classes of people. 137 S. Ct. at 1852–54. One could hardly conceive of higher-level Government officials short of the President and his Cabinet officers. In contrast, Rosenstein and Bridges were comparatively lower-level line employees within their agencies, and they are not being sued for any policymaking role. Instead, they are only sued—and will only be liable—to the extent that they themselves directly engaged in the unlawful infiltration of the Attkissons' computer systems.

'complementary' sources of liability." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001) (quoting *Carlson*, 446 U.S. at 19–20). Because *Ziglar* explicitly approved *Carlson* as good law, *Ziglar*, 137 S. Ct. at 1855, it is difficult to see how the possible existence of an FTCA claim could possibly constitute a reason under *Ziglar* to deny a *Bivens* cause of action.[6]

In short, the Attkissons' Complaint simply presents a specific fact-bound application of clearly established Fourth Amendment jurisprudence to hold lower-level Government officers liable for monetary damages for their overreach in conducting law-enforcement activities. Nothing about the case extends *Bivens* to a novel context, nor does the Complaint implicate the sort of separation-of-powers concerns that animated *Ziglar*.

### III. Because Warrantless Domestic Electronic Surveillance Clearly Violates Both the Fourth Amendment and the ECPA, any Claimed Defense on Qualified Immunity Grounds Is Wholly Unjustified.

None of the defendants is entitled to claim qualified immunity because the acts alleged in the Complaint violate clearly established rights under the Fourth Amendment and the ECPA. Although the Government seems to want to use qualified immunity as a blanket absolute immunity for almost any discretionary act by a governmental agent, the actual doctrine is much narrower. Qualified immunity does not protect federal officials from money damages if a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right

---

[6]   Although there are other theoretically relevant statutes, such as the Computer Fraud and Abuse Act, the Stored Communications Act, and the Foreign Intelligence Surveillance Act, it is not at all clear that any of them apply here, and even if they did, they do not provide a remedy for the sort of violation the Attkissons allege. Therefore, the mere existence of these statutes does not obviate the need for a *Bivens* remedy. As the *Ziglar* Court explicitly recognized, a *Bivens* remedy is especially needed in the search-and-seizure context because it provides useful "instruction and guidance to federal law enforcement officers." *Ziglar*, 137 S. Ct. at 1857.

was "clearly established" at the time of the challenged conduct. *E.g.*, *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Doe v. Broderick*, 225 F.3d 440, 446 (4th Cir. 2000).

The first requirement is satisfied when a plaintiff alleges a deprivation of constitutional or statutory rights, *Broderick*, 225 F.3d at 446, and courts must view the facts alleged in the light most favorable to the injured party when determining if established law is violated, *Tolan v. Cotton*, 572 U.S. 650, 655 (2014). As to the second requirement, a right is clearly established when "every reasonable official would have understood that what he is doing violates that right." *Covey v. Assessor of Ohio County*, 777 F.3d 186, 195–96 (4th Cir. 2015) (citation omitted).

The Fourth Amendment creates a clearly established right to be free from warrantless searches, absent consent or exigency. *See Groh v. Ramirez*, 540 U.S. 551, 563–64 (2004); *Covey*, 777 F.3d at 196. Indeed, the right of all-American citizens to be free from unreasonable government intrusion is at the "very core" of the Fourth Amendment. *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). Moreover, the Supreme Court has held that no reasonable officer could claim to be unaware of the "basic rule, … that, absent consent or exigency, a warrantless search of a home is presumptively unconstitutional." *Groh*, 540 U.S. at 564; *see also Gennusa v. Canova*, 748 F.3d 1103, 1113 (11th Cir. 2014) ("It has long been clear that even in sensitive cases involving domestic threats to national security law enforcement officials need a warrant before electronically intercepting private communications.") (citing *United States v. U.S. Dist. Court for the E. Dist. of Mich.*, 407 U.S. 297, 318–21 (1972)). Thus, there can be no plausible claim that the defendants in this case did not know that they needed a warrant before conducting surveillance on the Attkissons.

Similarly, the ECPA establishes a clear right to be free from interceptions of electronic communications. Section 2511(1)(a) of the ECPA makes it unlawful to "intentionally intercept[], endeavor[ ] to intercept, or procure[ ] any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication . . ." 18 U.S.C. § 2511(1)(a). Intentionally accessing computer storage and electronic communications without authority violates the ECPA. *Steve Jackson Games, Inc. v. U.S. Secret Service*, 36 F.3d 457, 462 (5th Cir. 1994) (affirming a judgement of damages to a plaintiff whose emails were seized in violation of the ECPA). Again, there can be no plausible claim that law-enforcement officers conducting electronic surveillance would not know the basic contours of the ECPA. Moreover, this case does not present novel factual scenarios. Instead, conducting electronic surveillance without legal authority is *precisely* what the ECPA is designed to prevent. No ambiguities of interpretation can save the defendants here.

Presumably because there is no plausible argument for qualified immunity in this case, the Government does not even try to argue that the allegations in the Complaint, if true, would somehow not violate clearly established law. Instead, the Government aims to sidestep the qualified immunity question altogether by bootstrapping what is actually a 12(b)(6) motion for failure to state a claim into a qualified immunity argument.

This is logically incoherent. The qualified immunity question is solely whether the facts alleged in the Complaint, if true, constitute a violation of clearly established law of which defendants should be aware. If so, then qualified immunity is unavailable. The question of whether the plaintiff has made sufficient factual allegations to defeat a motion to dismiss under Rule 12(b)(6) is a wholly separate question and has nothing to do with qualified immunity.

But in any event, the Attkissons' Complaint clearly satisfies the federal pleading standard. Under Federal Rule of Civil Procedure 8, a complaint is sufficient so long as it provides "a short and plain statement of the claim showing that the pleader is entitled to relief." The U.S. Supreme Court has repeatedly made clear that the complaint "need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *E.g.*, *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Johnson v. City of Shelby*, 135 S. Ct. 346, 347 (2014) (ruling that plaintiffs' complaint was sufficient because it "stated simply, concisely, and directly events that, they alleged, entitled them to damages …."). Moreover, when evaluating a Rule 12(b)(6) motion to dismiss, "a judge must accept as true all of the factual allegations contained in the complaint." *Erickson*, 551 U.S. at 94. Finally, the reviewing court must make all reasonable inferences in favor of the plaintiff. *E.g.*, *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (quotation omitted). Thus, a court should not grant a motion to dismiss unless the allegations relating to a specific claim are completely conclusory, or the remaining factual allegations, taken as a whole, state no claim for relief. *See Tobey v. Jones*, 706 F.3d 379, 386–87 (4th Cir. 2013).

Applying these standards, it is clear that the Attkissons' Complaint goes far beyond what is required to survive a motion to dismiss under any reading of Rule 8. The Attkissons provide specific factual details regarding the abnormal operation of their computers and related devices as well as the voluminous and detailed conclusions of sophisticated computer forensic analysts pointing to governmental intrusion and surveillance. Indeed, the Complaint clearly alleges facts showing that an illegal intrusion occurred and that the intrusion was directly traced back to the

federal government by forensic evidence. In addition, they now have the statement of Government whistleblower Ryan White describing the clandestine operation to hack into the Attkissons' computer systems. When taken together and treated as true under the standard of Rule 12, these specific, factual allegations reasonably establish that the Government Defendants violated the Attkissons' Fourth Amendment rights as well as their rights under the ECPA.

The boilerplate admonishment that in evaluating a motion to dismiss all factual allegations in a complaint must be treated as true is especially important in a case such as this one, where there is little ability for the plaintiffs on their own to prove their claims without access to sufficient discovery. Indeed, nearly all the evidence that the Attkissons will ultimately need to prove their claims is currently in the hands of the Government. Therefore, requiring the Attkissons to satisfy an overly burdensome pleading requirement would effectively allow Government officials to insulate themselves from all accountability merely by withholding needed information and then filing motions to dismiss to avoid ever having to disclose anything at all. As this Court has recognized, the burden on the Attkissons at this stage of the litigation cannot be too heavy because "a plaintiff may only have so much information at his disposal at the outset." *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 291 (4th Cir. 2012).

The Attkissons' Complaint documents in full detail, for 20 pages, the history of events concerning the illegal surveillance on their electronic devices as far back as April 2009 up until the filing of the first Complaint in 2014. To begin, the Complaint alleges that reporter Sharyl Attkisson produced a series of investigative journalism pieces critical of the federal government. This reporting relied in part on information she obtained from Government whistleblowers. The

18

Complaint also provides many factual details regarding the Executive Branch's general concern about Government employees leaking inside information to the press, particularly on issues where Government wrongdoing was being identified. More specifically, the Complaint alleges that several sources with close ties to the intelligence community approached Ms. Attkisson privately and informed her that the Government would likely monitor her electronically to identify her confidential sources, and also to track her investigative reporting. Compl. ¶¶ 29, 52, 55.

The Complaint also provides many examples of the erratic abnormal behavior of the Attkissons' various computers and devices, behavior that began shortly after the CBS reports at issue began to air. These allegations too do not simply present legal conclusions, but instead list instances of computers turning on and off on their own, alarm systems connected to the wireless network making unexplained noises, drop-offs, interference, connectivity issues, a computer completely self-destructing, and so on. Compl. ¶¶ 36, 38, 54, 69. The Complaint also alleges that conventional solutions were ineffective to remedy the problems. *Id.* ¶¶ 38, 46.

Next, the Complaint contains the expert conclusions of two computer forensic analyses conducted on the Attkissons' various devices. *Id.* ¶¶ 40–42, 66–68. Again, these analyses do not offer mere legal conclusions. Instead, they provide extensive factual determinations that led these experts to conclude that the Attkissons' computer systems had indeed been infiltrated and that unauthorized, remote, external surveillance had definitely occurred. The experts also concluded that remote communication with the Attkissons' system was executed through non-public Government IP addresses controlled, and operated by the United States Postal Service. *Id.* ¶¶ 42, 84. According to the Complaint, the forensic analyses concluded that a communications channel

was opened up between the referenced Government IP addresses and the Attkissons' computer system, establishing beyond doubt that a person or persons affiliated with the U.S. Government was communicating directly with the Attkissons' computer system on an ongoing basis. *Id.*

Finally, the Attkissons now have the statements of a Government whistleblower who has named names and confirmed that defendants Rosenstein, Bridges, and Henry were in fact the specific Government officials directly involved in the infiltration of the Attkissons' computers. Thus, contrary to the Government's assertion, the specific defendants named in this Complaint were not "picked out of a hat." Def. Mot. Dismiss 16. Rather, after being stonewalled by the Government for years, the Attkissons have finally been able to identify some of the line officers who were directly engaged in illegal surveillance against them. And so they have named them.

These new whistleblower statements, on top of all the other factual allegations in the Complaint, easily support a plausible inference that the defendants conducted illegal and unconstitutional surveillance activity. Indeed, it is frankly difficult to imagine how any plaintiff could possibly have provided *more* evidence of unconstitutional and illegal electronic surveillance before discovery. For these reasons, there is absolutely no basis for dismissing the Attkissons' Complaint, whether that dismissal is dressed up in the trappings of a qualified immunity argument or is presented as a motion to dismiss for failure to state a claim.[7]

---

[7]   The Government attempts to muddy the waters by claiming that the Attkissons' Complaint is somehow deficient because it mentions the Government's corrupt Silk Road Task Force. This is a red herring. The Attkissons are *not* alleging that it was the Silk Road Task Force itself that conducted the illegal surveillance on their computer systems. Instead, the relevant point is that the existence of the Silk Road Task Force shows that there was an interagency group of agents in Baltimore under Rosenstein's office that had access to, and use of, Government IP addresses—such as those belonging to the postal service—that forensic evidence reveals were used to hack

**IV.  Because the Attkissons Do Not Rely on Procurer Liability in their Complaint, the Government's Statutory Argument Regarding the ECPA Is Irrelevant.**

The Government devotes a long section of its Memorandum of Law to a discussion of the ECPA's statutory language regarding procurer liability. However, the Attkissons do *not* rely on procurer liability in their Complaint. Instead, the Attkissons' Complaint painstakingly details the voluminous forensic evidence documenting an unauthorized infiltration of their computer systems, as well as ongoing surveillance of their various electronic devices. This forensic analysis strongly suggests that the culprit is likely one or more Government officials, and the whistleblower statement confirms the direct involvement of each of the named Defendants in a clandestine operation that infiltrated the Attkissons' computer systems.

*As such, the Attkissons' Complaint provides sufficient factual allegations to support a claim for direct liability under the ECPA.* Section 2511(1)(a) of the ECPA makes it unlawful to "intentionally intercept[ ], endeavor[ ] to intercept, or procure[ ] any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication . . ." 18 U.S.C. § 2511(1)(a). Further, Section 2520 provides that "any person whose wire, oral, or electronic communication is intercepted . . . in violation of this chapter may in a civil action recover from the person or entity which engaged in that violation such relief as may be appropriate." 18 U.S.C. § 2520.

---

into the Attkissons' computers. In addition, because one of the defendants, former Secret Service agent Sean Bridges, is in prison for his illegal work on the Silk Road Task Force, it is clear that there was illegal computer work being performed out of the Baltimore office when Rosenstein was in charge. It is therefore not at all far-fetched to think that there could be another, covert, interagency group assigned to infiltrate the computers of journalists such as Sharyl Attkisson. This is precisely what the whistleblower statement confirms.

Based on the factual allegations in the Complaint, the Attkissons plausibly allege that each of the Defendants were involved in a clandestine operation designed specifically to intercept the Attkissons' electronic communications. Such direct efforts to intercept electronic communications constitute a clear and unambiguous violation of the statute and therefore easily defeat any argument that the facts as alleged are insufficient to state a claim under the ECPA.

Again, the Government attempts to muddy the waters by delving into potential statutory ambiguity surrounding whether the statute provides a private right of action for procurer liability.[8] But that discussion is completely irrelevant to the current Complaint. Whereas Holder and Donahoe were agency heads who may have indirectly requested a surveillance operation to be initiated, the Defendants named in the current Complaint are *the actual individuals who conducted the clandestine operation to infiltrate the Attkissons' computers*. And it is undisputed that the ECPA provides both liability and a private right of action against those who directly "endeavor[ ] to intercept… electronic communication." 18 U.S.C. § 2511(1)(a).

The Government's fall-back argument is that the Attkissons' Complaint, at least with regard to Defendants Rosenstein and Henry, amounts to an allegation of procurer liability because it is possible that they only supervised the clandestine operation and therefore did not directly endeavor to intercept the Attkissons' communications. This is a meaningless attempt to split hairs.

The ECPA nowhere states that its liability applies only to the specific individual who is

---

[8]   The Fourth Circuit's discussion of the ECPA in *Attkisson v. Holder* did not definitively resolve the question of whether § 2520 supports a civil remedy on the basis of procurer liability, 925 F.3d at 622–23, but in any event the Attkissons are not relying on a theory of procurer liability in this Complaint, so anything the prior court had to say about procurer liability would be irrelevant.

sitting at a computer literally typing in the keystrokes that initiate the infiltration. Indeed, such a large carve-out of liability would defeat the broad remedial aims of the statute,[9] and it would result in strange anomalies. Consider two people together infiltrating someone's computer system. One is sitting at the keyboard typing while the other one is looking over her shoulder reading the information. On the Government's interpretation, the victim of the infiltration could only sue the one at the keyboard, but not the other—equally culpable—person. This makes no sense.

Fortunately, nothing in the statutory language compels such a result. Section 2511(1)(a) makes it unlawful to "endeavor[ ] to intercept…electronic communication," and Section 2520 allows recovery from anyone who "engaged in" a violation of Section 2511(1)(a). But clearly one can be endeavoring to intercept electronic communications even if one is not the person literally typing the keystrokes. And if that person is endeavoring to intercept wireless communication, then that person is just as clearly engaged in a violation of Section 2511(1)(a).

Accordingly, while the language in Section 2520 may not apply to a high-level official who merely asks others to initiate an electronic surveillance operation, there is no reason it should not apply to all those directly involved in running the day-to-day activities of that operation. This is precisely what the Complaint alleges with regard to each of the Defendants.

## V.    The Attkissons' Claims Are Not Time-Barred.

It is difficult to overstate just how disturbing and Kafkaesque the Government's statute of

---

[9]     *See, e.g.*, S. Rep. No. 99-541, at 5 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 3555, 3559 (stating, "[T]he law must advance with the technology to ensure the continued vitality of the fourth amendment. Privacy cannot be left to depend solely on physical protection, or it will gradually erode as technology advances. Congress must act to protect the privacy of our citizens. If we do not, we will promote the gradual erosion of this precious right.").

limitations argument is. After all, this case strikes at the heart of American democracy. Ms. Attkisson, a veteran award-winning journalist, alleges that officials hacked into her family's computer systems without a warrant after Attkisson produced news stories relying on confidential informants. Significantly, this is no mere speculative allegation. As discussed above, the Complaint provides numerous factual allegations, including allegations based on reports of expert computer forensic analysts and whistleblower statements confirming illegal Government activity.

However, over six years of litigation, the Government has repeatedly stonewalled. First, the Government refused even to accept service of process for any unidentified agents, amazingly using the circular argument that service is not possible until the Attkissons have actually identified the defendants, which of course they had little way of doing without discovery. Second, the Government has continually refused to turn over *any* documents or allow *any* depositions designed to help determine the identity of those agents. Third, to the extent that the Attkissons identified two agency heads who plausibly were involved in ordering the illegal intrusions, the Government asserted numerous legal impediments. *In short, the Government has argued that the federal officials who were named could not be sued and the officials who were unnamed could not be served with process, and no discovery was possible with regard to any of them.*

Finally, despite the Government's repeated stonewalling, the Attkissons have at last been able to obtain information from a Government whistleblower that for the first time identifies the names of some of the Government personnel directly involved in the unlawful operation. Yet, in response the Government attempts to say that this crucial information it spent literally years hiding from the Attkissons has arrived too late. Such Government obstruction and malfeasance cannot be

rewarded. The Government simply cannot be permitted to obfuscate in an effort to run out the clock on this litigation.

>   ### A. The Attkissons' Complaint Is Not Time-Barred Because the Government's Repeated and Unjustified Obfuscations in this Case Require Equitable Tolling of the Statute of Limitations.

As the Government acknowledges, Def. Mot. Dismiss 23, the Attkissons' *Bivens* claims are governed by the Maryland statute of limitations. However, Maryland tolls the statute of limitations where knowledge of the cause of action has been kept from the plaintiff by the obfuscatory acts of the defendant. Md. Code Ann., Cts. & Jud. Proc. § 5-203. As to the ECPA claim, the U.S. Supreme Court has similarly held that "time bars in suits between private parties are presumptively subject to" tolling on equitable grounds, *United States v. Kwai Fun Wong*, 135 S. Ct. 1625, 1630 (2015), and that a fraudulent concealment doctrine is to be read into every federal statute of limitations, *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946).

Equitable tolling is appropriate when the defendant misleads the plaintiff or creates excessive hurdles to the plaintiff's discovery of the full scope of the cause of action. *See Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89, 96 (1990) (stating that equitable tolling applies when "the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct …."). Equitable tolling is necessarily a "fact-specific determination," but when the defendant deliberately conceals crucial information, equitable tolling is appropriate. *Cabello v. Fernandez*, 402 F.3d 1148, 1154–55 (11th Cir. 2005) (holding that plaintiffs were entitled to equitable tolling after the defendants' deliberate concealment of the events surrounding Cabello's

death). Plaintiffs satisfy their burden to show affirmative concealment when they can allege the defendant employed "some trick or contrivance intended to exclude suspicion and prevent inquiry." *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 553–54 (4th Cir. 2019) (holding that facts including the creation of sham entities, the use of fake names and addresses, and the intent to disguise and conceal payments were "adequate factual allegations of acts of concealment" enough to warrant equitable tolling). When a plaintiff is entitled to equitable tolling, "the clock stops upon the tolling of the limitations period and begins again when the impediment to bringing suit is removed." *Cabello*, 402 F.3d at 1156.

If ever there were a case where equitable tolling was appropriate, this is it. The Government has for years deliberately lied and covered up even the existence of the surveillance operation against the Attkissons. Moreover, the Government has refused to allow meaningful discovery to allow the Attkissons to develop the factual material they need or even figure out whom they should be suing. This despite the fact that such information is uniquely in the hands of the Government and the Attkissons have little ability to learn further details about clandestine governmental operations without discovery.

As a result, it was only in August 2019, when the whistleblower Ryan White came forward, that the Attkissons could even determine whom they should be suing. Moreover, White's statement demonstrates that the Government has been lying for years in denying the existence of this covert group that was tasked with hacking the computers of U.S. journalists.

The Government argues that, even if fraudulent concealment occurred, the statute of limitations should not be tolled because the Attkissons did not pursue their claims with sufficient

diligence. This contention is jaw-dropping in its malevolence and absurdity. The Attkissons have for years tried every avenue possible to gain knowledge from the Government about the clandestine hacking of their computers, only to be stymied at every turn. Indeed, despite doggedly trying to break through the Government's repeated stonewalling, the Attkissons have been thwarted by the Government's repeated fraudulent concealments and refusals to provide the information necessary for the Attkissons to fully bring their claims. It is only now, through the intervention of a third-party whistleblower, that the Government's fraudulent concealment has been exposed. If this Court allows the Government now to claim that the limitations period has run, it will be inviting the Government to use the same playbook of obfuscation and deceit to run out the clock on future litigation as well. Especially when the surveillance involves a respected journalist, such obfuscation strikes at the heart of American democracy and must not be allowed to carry the day.

### B. Alternatively, Under the Relation-Back Doctrine, this Complaint Is Not Time-Barred Because the Government Has Been on Notice Concerning the Attkissons' Allegations Since the Beginning of this Litigation.

The primary purpose of a statute of limitations is to protect defendants from unfair surprise. *Artis v. District of Columbia*, 138 S. Ct. 594, 608 (2018). Therefore, even if a new claim is brought after a limitations period has run, it may be deemed to "relate back" to a timely-filed original pleading. Indeed, Rule 15(c)(1)(C) of the Federal Rules of Civil Procedure, which governs when an amended pleading relates back to an original complaint, was specially drafted to address the problems plaintiffs face in filing suits against the federal government, particularly when, as here, they lack crucial information, name the wrong defendants as a result, and later are able to gather

further information in order to correct their claims. *See Krupski v. Costa Crociere*, 560 U.S. 538, 550 (2010).

The relation-back doctrine saves amended complaints that "arose out of the conduct, transaction, or occurrence set out" in a timely original complaint. Fed. R. Civ. P. 15(c)(1)(B). The idea is that new claims are allowed even after the limitations period has run, so long as the defendant "received such notice of the action that it will not be prejudiced in defending on the merits" and the defendant "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." *Robinson v. Clipse,* 602 F.3d 605, 608 (4th Cir. 2010) (citing Fed. R. Civ. P. (15)(c)(1)(C)).

The primary inquiry in a relation-back case is whether the newly named defendant will suffer prejudice. Thus, if a party "expected or should have expected, within the limitations period, that it was meant to be named a party in the first place," there is no justification for applying the statute of limitations to block the new claim. *Id.* at 609 (holding that the defendant was not prejudiced in defending on the merits because he received notice and, had he been named as a defendant in the original complaint, he would have been in the same position he is now, with no arguments or decisions made on the merits yet); *see also, e.g.*, *Rumble v. 2ⁿᵈ Ave Value Stores*, No. 1:19-cv-1212, 2020 WL 1034359 at *4 (E.D. Va. Mar. 3, 2020) (holding that an amended complaint related back to the original complaint that named John Doe as the defendant because the defendant was on notice of the suit within the limitations period).

These same principles should also apply when a case is dismissed without prejudice, as the Fourth Circuit did in this case. When a court dismisses a suit without prejudice to refile, the court

is saying that given certain amendments there is a viable complaint that can be brought again. *See Semtek Intern. Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 505 (2001). Therefore, as with an amended complaint, the appropriate question is solely whether or not the defendants will suffer prejudice from the delay.

In this case it is clear that there is no prejudice to Defendants Rosenstein and Henry. Both are being represented by the U.S. Attorneys' Office, which has known about and been involved in this case from the outset.[10] Just as in *Robinson*, the current complaint is being brought based on the exact same events as the original complaint; the only difference is that now the Attkissons can for the first time actually name the John Doe defendants. And, again just as in *Robinson*, here Rosenstein and Henry are in the same position now to defend the claims brought against them as they would have been had they been originally named. 602 F.3d at 608. The statute of limitations' purpose of protecting defendants from an unfair surprise is not served here.

**VI.  Because the Unlawful Surveillance Operation Giving Rise to the Attkissons' Claims Both Originated in Maryland and Was Carried Out in Maryland, Venue Is Proper There.**

The Government's argument that venue is improper in Maryland borders on the frivolous. As the Government acknowledges, Def. Motion Dismiss 27, the Attkissons' claims are subject to the general federal venue statute. Thus, those claims may be filed in any judicial district where a substantial portion of the actions or omissions giving rise to the claim occurred. 28 U.S.C. § 1391(b)(2). Moreover, to survive a motion to dismiss for improper venue when no evidentiary

---

[10]   In addition, this case has generated considerable media attention, so it is implausible to believe that Rosenstein and Henry were not personally aware of it.

hearing has been held, the plaintiff need only make a prima facie showing of venue. *Mitrano v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2004). Finally, it is hornbook law that, when several different forums are involved in the transactions leading up to the dispute, it is "possible for venue to be proper in more than one judicial district." *Id*. Thus, "the question is not whether a given district is the best venue, but whether the events or omissions that occurred there are sufficiently substantial." *Pinnacle Advisory Group, Inc. v. Krone*, No. ELH-19-02988, 2020 WL 1285527 at *9 (D. Md. Mar. 18, 2020) (internal quotations and citation omitted).

The Attkissons' Complaint alleges that the entire surveillance operation giving rise to this cause of action arose from the activities of members of a clandestine multi-agency task force based in Baltimore. Compl. ¶¶ 12, 28. Thus, Baltimore, Maryland is where Defendants ordered, authorized, and carried out the infiltration and surveillance operation of the Attkissons' computer systems. Compl. ¶¶ 12, 42-43. This work is clearly sufficient to justify venue in Maryland.

While some of the Attkissons' injuries may have occurred in Virginia, every other event in "the entire sequence of events underlying the claims" occurred in Maryland. *Mitrano*, 377 F.3d at 406. Accordingly, it is truly inexplicable how the Government can argue that venue is improper here. Indeed, the actions that are alleged to have taken place in Maryland constitute not just a substantial portion of the events giving rise to the Attkissons' claim, but almost all of the core wrongdoing that is alleged. Thus, there can be no doubt that venue is proper under § 1391(b).

**VII.    This Court Has Proper Personal Jurisdiction Over Defendant Henry Because His Alleged Illegal Activities Occurred in Maryland and the Attkissons' Claims Arise from these Illegal Activities.**

As with the Government's venue argument, its claim that this Court lacks personal

jurisdiction over Defendant Henry is equally frivolous.

Personal jurisdiction over a nonresident defendant is proper when "(1) an applicable state long-arm statute confers jurisdiction and (2) the assertion of that jurisdiction is consistent with constitutional due process." *Id.* Federal courts follow Maryland courts' interpretation of the state long-arm statute as coterminous with the constitutional inquiry. *See ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 622 (4th Cir. 1997) (citing Fed. R. Civ. Pro. 4(k)(1)); *Mackey v. Compass Mktg, Inc.*, 391 Md. 117, 141 (2006).[11] In determining whether specific jurisdiction exists, Maryland courts consider the extent to which the defendant has purposefully availed himself of the privilege of conducting activities in the state; whether the plaintiffs' claims arise out of those activities; and whether the exercise of personal jurisdiction would be constitutionally "reasonable." *Id.*

The Complaint alleges that Henry was physically located in Maryland when he worked with Rosenstein and others and conducted the unlawful surveillance and hacking of the Attkissons' computer systems. Compl. ¶¶ 17, 28.  Such direct, purposeful, and volitional involvement with domestic surveillance projects based out of Baltimore constitutes sufficient contacts for due process purposes, and those contacts are directly related to the Attkissons' causes of action.

In addition, the Complaint alleges that Henry was a Government agent collaborating with Defendant Rosenstein, a resident of Maryland, Compl. ¶ 12, and that Rosenstein ordered Henry to

---

[11]   To the extent Maryland courts continue to analyze the state long-arm statute, *see Mackey v. Compass Mktg, Inc.*, 391 Md. 117, 141 n.6 (2006), Section 6-103(b)(1) confers jurisdiction over a person who "transacts any business or performs any character of work or service in the state." Md. Code Ann. Cts & Jud. Proc. § 6-103(b)(1). The Attkissons' complaint alleges that Henry was physically located in Maryland as part of a clandestine inter-agency task force that conducted its cyber-operations in Baltimore. Compl. at ¶ 28. Thus, the facts alleged are easily sufficient to establish that Henry performed work in the state.

conduct the unlawful surveillance, *id.* ¶ 28. Such factual allegations are sufficient to establish that Henry "substantially collaborated with a [Maryland] resident and that joint enterprise constituted an integral element of the dispute." *Tire Eng'g v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 302 (4th Cir. 2012). Henry and Rosenstein's joint enterprise, the surveillance operation of the Attkissons, is core to the Attkissons' constitutional and statutory claims. Indeed, the Attkissons' claims entirely arise out of Henry's activities in Maryland.

The Government completely misreads a footnote in the Fourth Circuit's decision in *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 398 n.7 (4th Cir. 2003), and uses it to argue for a radical alteration of well-settled jurisdiction doctrine. According to the Government, a plaintiff must not only show that the defendant committed volitional acts in the forum state, but *also* that those acts caused harm in the forum state. This is emphatically not the law, and no U.S. Supreme Court or federal appellate court decision has ever held that *both* the defendant's acts and the plaintiff's harm must be felt in the state in order for personal jurisdiction to be appropriate. Indeed, the footnote quoted in the Government's Brief actually addresses a completely different situation: when a defendant acting *out-of-state* causes in-state harm. In such circumstances, plaintiffs can potentially establish jurisdiction by showing that even though the tortious acts took place out-of-state, the harm was felt in-state. And the Fourth Circuit quotes the U.S. Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783 (1984), establishing this so-called "effects test." *See Carefirst*, 334 F.3d at 397-98.

But this is *not* a case where the plaintiff is trying to get jurisdiction over a defendant who acted out-of-state to cause in-state effects. Instead, it is precisely the opposite scenario. The

Attkissons allege that Henry acted *in Maryland* to cause harm in Virginia. Jurisdiction in such a case does not require the effects test at all. There is simply jurisdiction because the defendant committed volitional in-state acts that are directly related to the cause of action. Where the harm is felt is irrelevant.

Finally, Maryland's jurisdiction over Henry does not offend principles of "fair play and substantial justice." The Complaint alleges that Henry physically worked in Maryland and deliberately created contacts with Rosenstein and the Baltimore-based task force; in no sense was his relationship with Maryland "random, fortuitous, or attenuated." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 480 (1985). Henry conducted unlawful surveillance from Maryland and caused foreseeable injuries from within the state, making it reasonable for him to be called to account there for such injuries. Henry's physical presence and activities in Maryland, as well as his close proximity in residence, renders suit in Maryland not unreasonably burdensome. Maryland litigation will not severely impair Henry's ability to call witnesses or defend himself, and any inconveniences Henry might allege surely do not achieve constitutional magnitude.

## VIII.   Defendants Rosenstein and Henry Were Properly Served.

Finally, there is absolutely no basis for dismissing this Complaint based on service-of-process issues. Here, the Government raises two objections. First, the Government contends that the Complaint should be dismissed because the Attkissons did not serve the United States in addition to the individual defendants. Because the Attkissons are suing Rosenstein and Henry in their individual capacities and neither Rosenstein nor Henry is, to the Attkissons' knowledge, a current employee of the U.S. Government, counsel relied on caselaw suggesting that service on

the United States was unnecessary. *See Vaccaro v. Dobre*, 81 F.3d 854, 857 (9th Cir. 1996).

It is true that Federal Rule of Civil Procedure 4 was amended in 2000 to require, pursuant to Rule 4(i)(3), service on the United States even in such individual capacity suits, but the Committee notes to the amendment make clear that Rule 4(i)(3) was never intended to be fatal to a lawsuit. The notes state:

> Paragraph (3) is amended *to ensure that failure to serve the United States in an action governed by paragraph 2(B) does not defeat an action*. This protection is adopted because there will be cases in which the plaintiff reasonably fails to appreciate the need to serve the United States. There is no requirement, however, that the plaintiff show that the failure to serve the United States was reasonable. *A reasonable time to effect service on the United States must be allowed after the failure is pointed out.*

Fed. R. Civ. P. 4 Advisory Committee Notes (2000) (emphasis added).

Here, the Attkissons were unaware of the requirement to serve the United States in a *Bivens* action, and the Government's motion to dismiss is the first time this issue has arisen or been pointed out to Plaintiffs. Therefore, the Attkissons request a reasonable time to cure under Fed. R. Civ. P. 4(i)(4), which, as detailed above, was amended in 2000 explicitly to address this situation. Under this provision, "the court *must* allow a party a reasonable time to cure its failure to…serve the United States under Rule 4(i)(3), if the party has served the United States officer or employee" (emphasis added). Because proper service was completed on the individual officers, this Court is required under the Rule to allow time to cure. There is certainly no basis for dismissing an entire Complaint because of such a minor error, and indeed the Rules explicitly state otherwise.

Second, the Government contends that the personal service on Rosenstein was defective. Federal Rule of Civil Procedure 4(e)(2)(B) allows for service on an individual by "leaving a copy

of [the summons and Complaint] at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there." On February 7, 2020, Plaintiffs served Defendant Rosenstein at his home in Bethesda, Maryland, by leaving a copy of the summons and Complaint with his wife Lisa Barsoomian. *See* Proof of Service attached hereto as **Exhibit** 1.  Mrs. Barsoomian surely qualifies as someone of suitable age and discretion, given that she herself is an experienced licensed attorney. As indicated in the narrative of the proof of service, *see* **Exhibit** 2, the process server followed Mrs. Barsoomian's verbal directions and left the summons and Complaint in the mailbox next to the door, *see* **Exhibit** 3. Out of an abundance of caution, the process server returned a few minutes later, and the papers had been removed from the mailbox.

Service in this manner not only satisfies Fed. R. Civ. P. Rule 4(e)(2)(B), but also is sufficient under Fed. R. Civ. P. 4(e)(1) because it follows service of process rules under the Maryland Rules of Civil Procedure.[12] Thus, the Complaint was appropriately served on both Rosenstein and Henry.[13] Accordingly, Defendants' motion to dismiss under Rule 12(b)(5) should be denied, and Plaintiffs should be given reasonable time to serve the United States.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.

---

[12]   See MD. Rule 2-121, service is proper if, "the person to be served is an individual, by leaving a copy of the summons, complaint, and all other papers filed with it at the individual's dwelling house or usual place of abode with a resident of suitable age and discretion."
[13]   The Government does not allege any failure to serve Henry. As to Rosenstein, to the extent that the Government's argument relies on the attached proof of service not being filed, Fed. R. Civ. P. 4(l)(3) states, "Failure to prove service does not affect the validity of service."

35

Respectfully submitted this 3rd day of August, 2010.

SHARYL THOMPSON ATTKISSON
JAMES HOWARD ATTKISSON
SARAH JUDITH STARR ATTKISSON

/s/ C. TAB TURNER

Tab Turner, Esq. (*Pro Hac Vice*)
**TURNER & ASSOCIATES, P.A**.
4705 Somers Avenue, Suite 100
North Little Rock, Arkansas 72116
501-791-2277 – Office
501-791-1251 – Facsimile
Tab@tturner.com

Paul Schiff Berman (*Pro Hac Vice*)
Attorney at Law
9 Hesketh St.
Chevy Chase, MD. 20815
202-569-6837 - Phone pberman@law.gwu.edu

*COUNSEL FOR PLAINTIFFS*


## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 3, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will transmit a true and correct copy of the same to the following:

JOSEPH H. HUNT
Assistant Attorney General, Civil Division

C. SALVATORE D'ALESSIO, JR.
Acting Director, Torts Branch

ANDREA W. MCCARTHY
Senior Trial Counsel, Torts Branch

JAMES R. WHITMAN (D.C. Bar No. 987694)

Senior Trial Attorney
United States Department of Justice
Torts Branch, Civil Division
P.O. Box 7146
Ben Franklin Station
Washington, D.C. 20044-7146
Tel: (202) 616-4169
Fax: (202) 616-4314
E-mail: james.whitman@usdoj.gov

Attorneys for Rod Rosenstein and Shawn Henry


/s/ C. TAB TURNER
Tab Turner