# EXHIBIT D

*Attkisson v. Holder*, No. 18-1677,
ECF No. 21 (4th Cir.)

RECORD NUMBER: 18-1677

# United States Court of Appeals

### *for the*

# Fourth Circuit

SHARYL THOMPSON ATTKISSON; JAMES HOWARD ATTKISSON;
SARAH JUDITH STARR ATTKISSON,

*Plaintiffs/Appellants,*

– v. –

ERIC H. HOLDER, JR., Individually; PATRICK R. DONAHOE, Individually;
UNKNOWN NAMED AGENTS OF THE UNITED STATES DEPARTMENT
OF JUSTICE, In their individual capacities; FEDERAL BUREAU OF
INVESTIGATION; MCI COMMUNICATIONS SERVICES,
INCORPORATED, d/b/a Verizon Business Services; CELLCO PARTNERSHIP,
d/b/a Verizon Wireless; CELLCO PARTNERSHIP, d/b/a Verizon Wireless;
VERIZON VIRGINIA, LLC,

*Defendants/Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA

# OPENING BRIEF OF APPELLANTS

PAUL S. BERMAN
9 Hesketh Street
Chevy Chase, MD 20815
(202) 569-6837

CLYDE T. TURNER
TURNER & ASSOCIATES
4705 Somers Avenue, Suite 100 North
Little Rock, AR 72116
(501) 791-7270
*Counsel for Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _____          Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____
(name of party/amicus)

_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?      YES      NO


2.      Does party/amicus have any parent corporations?                                YES      NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:




3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                      YES      NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?        YES    NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)     YES    NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                          YES    NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _____    Date: _____

Counsel for: _____

## CERTIFICATE OF SERVICE
**************************
I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____          _____
(signature)                                        (date)

- 2 -

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................ iii

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION ............................ 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ........................................ 2

STATEMENT OF THE CASE ........................................................... 3

STATEMENT OF FACTS ............................................................... 5

SUMMARY OF ARGUMENT .............................................................. 14

ARGUMENT ........................................................................ 19

    I.    STANDARD OF REVIEW ....................................................... 19

    II.   DISCUSSION OF ISSUES ..................................................... 21

        A.    The Attkissons' *Bivens* Claim Under the Fourth Amendment Is Cognizable Because Their Complaint Alleges An Unlawful Warrantless Search By Government Agents, Just Like *Bivens* Itself ........................... 21

             1.    The U.S. Supreme Court In *Ziglar* Recently Reaffirmed The Continuing Viability Of Bivens Claims ........................................ 22

             2.    None Of The Concerns Animating *Ziglar*'s Refusal To Extend *Bivens* Is Present In This Case .................................................. 23

        B.    The Attkissons' Complaint States A Valid Cause Of Action For A Violation Of The ECPA, Both By Those Defendants Who Infiltrated The Attkissons' Computer Systems And By Those Who Procured Others To Do So ........................... 32

             1.    There Is No Dispute That, As Originally Drafted, The ECPA Provided An Explicit Private Right Of Action Against Both Direct Violators And Procurers ..................................... 33

i

2.      The 1986 Amendments To The ECPA Made
        Cosmetic Changes To The Relevant Statutory
        Language, But Did Nothing To Alter The Core
        Statutory Scheme ...........................................................34

        a.      The New Section 2520 Is Most Logically
                Read To Retain A Cause Of Action For
                Any Violation Of Section 2511...........................35

        b.      The Legislative History Is Devoid Of Any
                Indication That Congress Intended To
                Make A Major Substantive Change To
                The Statutory Scheme When It Amended
                Section 2520 .......................................................38

C.      The Attkissons' Complaint Provided Sufficient Factual
        Allegations Against Defendants Holder, Donahoe ,
        And John Does To Survive A Motion To Dismiss On
        The Attkissons' Bivens And ECPA Claims ............................40

D.      The District Court Abused Its Discretion In Denying
        The Attkissons Leave To Amend Their Complaint To
        Add An ECPA Claim Against Verizon Because
        Plaintiffs' Amended Complaint Was Not Prejudicial
        To Verizon, Was Not Filed In Bad Faith, And Stated A
        Sufficient Non-Frivolous Cause Of Action Sufficient
        To Survive A Motion To Dismiss...............................................52

        1.      The Attkissons' Amended Complaint Was Based
                On Information Discovered After The Initial
                Pleading Stage And Thus Was Not Offered In
                Bad Faith Nor Was It Prejudicial To Verizon
                Because Only Limited Discovery Had Been
                Conducted And The Amended Complaint Was
                Filed Far In Advance Of Trial ........................................54

        2.      The Attkissons' Amended Complaint Was Not
                Futile Because The New ECPA Claim Against
                Verizon Alleged A Valid, Non-Frivolous Cause
                Of Action Consistent With Federal Rule Of Civil
                Procedure 8 ..................................................................57

CONCLUSION AND REQUEST FOR RELIEF..................................................61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)......................................................................40, 47, 50, 54

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..............................................................................40, 50, 54

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*,
   403 U.S. 388 (1971)..............................................................................*passim*

*Carlson v. Green*,
   446 U.S. 14 (1980)......................................................................................30, 31

*Corr. Servs. Corp. v. Malesko*,
   534 U.S. 61 (2001)................................................................................................31

*Covey v. Assessor of Ohio County*,
   777 F.3d 186 (4th Cir. 2015) ...........................................................................19

*Doe v. Hagenbeck*,
   870 F.3d 36 (2d Cir. 2017) ...............................................................................27

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
   637 F.3d 435 (4th Cir. 2011) ...........................................................................40

*Edwards v. City of Goldsboro*,
   178 F.3d 231 (4th Cir. 1999) ...........................................................................55

*Erickson v. Pardus*,
   551 U.S. 89 (2007)..............................................................................................40

*Foman v. Davis*,
   371 U.S. 178 (1962)...........................................................................53, 54, 55, 60

*Fourco Glass Co. v. Transmirra Prods. Corp.*,
   353 U.S. 222 (1957)..........................................................................................39

*Galustian v. Peter*,
   591 F.3d 724 (4th Cir. 2010) ....................................................................20, 54

*Gennusa v. Canova*,
   748 F.3d 1103 (11th Cir. 2014) ......................................................................31

*González v. Vélez*,
    864 F.3d 45 (1st Cir. 2017)...................................................................27

*Gustafson v. Adkins*,
    803 F.3d 883 (7th Cir. 2015) ...........................................................23

*Hernandez v. Mesa*,
    885 F.3d 811 (5th Cir.), *petition for cert filed*, No. 16-1678 (2018).............27

*Jerra v. United States*,
    No. 2:12–cv–01907–ODW, 2018 WL 1605563 (C.D. Cal. Mar. 29,
    2018), *appeal filed sub nom. Jerra v. Magana*, No. 18-55678,
    2018 WL 1605563 (9th Cir. May 25, 2018)............................................26, 27

*Johnson v. City of Shelby*,
    135 S. Ct. 346 (2014)..................................................................40, 50

*Johnson v. Oroweat Foods Co.*,
    785 F.2d 503 (4th Cir. 1986) ...........................................................20, 54

*Laber v. Harvey*,
    438 F.3d 404 (4th Cir. 2006) ...........................................................55

*Lanuza v. Love*,
    No. 15-35408, 2018 WL 3848507 (9th Cir. Aug. 14, 2018)..................25, 27

*Liff v. Office of Inspector Gen. for U.S. Dep't of Labor*,
    881 F.3d 912 (D.D.C. 2018)...............................................................27

*Lonegan v. Hasty*,
    436 F. Supp. 2d 419 (E.D.N.Y. 2006) ...............................................37

*McCarthy v. Bronson*,
    500 U.S. 136 (1991).......................................................................36

*McLean v. Gutierrez*,
    No. 15-275-RGK, 2017 WL 6887309 (C.D. Cal. Sept. 28, 2017)..........26, 27

*Mitchell v. Forsyth*,
    472 U.S. 511 (1985).......................................................................32

*Moore v. Dish Network, LLC*,
    Civil Action No. 3:13–CV–36, 2014 WL 2214714
    (N.D.W. Va. May 28, 2014)...............................................................56

*Nanni v. Aberdeen Marketplace, Inc.*,
    878 F.3d 447 (4th Cir. 2017) ...........................................................19

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
　591 F.3d 250 (4th Cir. 2009), *cert. denied*, 138 S. Ct. 2657 (2018) .......19, 40

*Peavy v. WFAA-TV, Inc.*,
　221 F.3d 158 (5th Cir. 2000) ........................................................................37

*Robert E. Lee & Co. v. Veatch*,
　301 F.2d 434 (4th Cir. 1961) ........................................................................39

*Robertson v. Sea Pines Real Estate Cos.*,
　679 F.3d 278 (4th Cir. 2012) ...................................................................43, 50

*Rodriguez v. Swartz*,
　No. 15-16410, 2018 WL 3733428 (9th Cir. Aug. 7, 2018), *stay
　granted*, 2018 U.S. App. LEXIS 22710 (9th Cir. Aug. 15, 2018) ..........22, 27

*Scott v. Family Dollar Stores, Inc.*,
　733 F.3d 105 (4th Cir. 2013) ...................................................................20, 55

*Stone v. Instrumentation Lab. Co.*,
　591 F.3d 239 (4th Cir. 2009) ........................................................................19

*Tobey v. Jones*,
　706 F.3d 379 (4th Cir. 2013) ...................................................................20, 60

*United States v. U.S. Dist. Court for the E.D. of Mich.*,
　407 U.S. 297 (1972) ......................................................................................32

*Vanderklok v. United States*,
　868 F.3d 189 (3d Cir. 2017) .........................................................................27

*Woods v. City of Greensboro*,
　855 F.3d 639 (4th Cir.), *cert. denied sub nom. City of Greensboro v.
　BNT Ad Agency, LLC*, 138 S. Ct. 558 (2017)..............................................19

*Ziglar v. Abbasi*,
　137 S. Ct. 1843 (2017).......................................................................*passim*

## Statutes & Other Authorities:

U.S. Const., amend. I ................................................................27, 41, 46

U.S. Const., amend. IV .......................................................................*passim*

U.S. Const., amend. VIII........................................................................26

18 U.S.C. § 1030(a)(4) .................................................................................60

18 U.S.C. § 1030(a)(5) .................................................................................60

18 U.S.C. § 2511 .....................................................................15, 16, 35, 38

18 U.S.C. § 2511(1)(a) .........................................................15, 33, 35, 58

18 U.S.C. § 2520 ..............................................................................*passim*

28 U.S.C. § 1291 ...........................................................................................1

28 U.S.C. § 1331 ...........................................................................................1

Fed. R. Civ. P. 8 .....................................................................16, 18, 40, 42

Fed. R. Civ. P. 8(a)(2) ................................................................................42

Fed. R. Civ. P. 12 ...................................................................................2, 42

Fed. R. Civ. P. 12(b)(6) .......................................................................16, 17, 40

Fed. R. Civ. P. 15(a) ...................................................................................43

Fed. R. Civ. P. 15(a)(2) ........................................................................17, 53

Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351,
    § 2520, 82 Stat. 197 (1968) ...........................................................34

S. Rep. No. 95-797 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 3555 ...................38

S. Rep. No. 99-541 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 3555 ...................37

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

Plaintiffs Sharyl Attkisson, James Howard Attkisson, and Sarah Judith Starr Attkisson originally filed suit in the Superior Court for the District of Columbia, and Defendants then removed the case to the United States District Court for the District of Columbia on February 18, 2015.  JA228-29.[1]  Because the suit alleged claims under the U.S. Constitution, the federal court had subject matter jurisdiction over the suit pursuant to 28 U.S.C. § 1331 (2012).  In September 2015 the Attkissons filed a second suit, alleging claims under the U.S. Constitution, federal statutes, and local law.  JA229.  In July 2016 the two actions were consolidated, and in March 2017 the consolidated suit was transferred to the Eastern District of Virginia.  *Id.*

On September 22 and November 1, 2017, the District Court dismissed several claims in the consolidated suit, JA155; JA244, and on May 15, 2018 the District Court issued a final order dismissing all remaining claims (and also refusing to grant the Attkissons leave to amend their Complaint), JA668-69, thus creating a final appealable judgment.  On June 14, 2018, Appellants filed their timely appeal.  JA671-73.  This Court therefore has appellate jurisdiction pursuant to 28 U.S.C. § 1291 (2012).

---

[1] "JA" refers to the Joint Appendix filed herewith.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.  Did the District Court misapply recent U.S. Supreme Court precedent to
    dismiss improperly a *Bivens* suit even though the suit, like *Bivens* itself,
    alleged that government officials conducted an unlawful warrantless search
    in violation of plaintiffs' Fourth Amendment rights?

2.  Did the District Court err when it interpreted the Electronic Communications
    Privacy Act only to provide a private cause of action against those who
    intercept electronic communication, but not those who procure others to
    intercept such communication?

3.  Did Plaintiffs' thirty-nine page Complaint provide sufficiently specific
    factual allegations against Defendants Holder, Donahoe, and John Does to
    provide adequate notice pleading under Federal Rule of Civil Procedure 8
    and plausibly state a cause of action, especially given that these factual
    allegations must be treated as true for purposes of evaluating any motion to
    dismiss under Federal Rule of Civil Procedure 12?

4.  Did the District Court abuse its discretion in denying the Attkissons leave to
    amend their complaint to add the Verizon Defendants, given that the extent

of Verizon's involvement in the unlawful surveillance was only uncovered

through the limited discovery permitted by the Court, and given that Federal

Rule of Civil Procedure 15 dictates that courts should "freely give leave" to

amend complaints?

## STATEMENT OF THE CASE

Appellants Sharyl Attkisson, James Howard Attkisson, and Sarah Judith

Starr Attkisson have filed complaints alleging that Appellees Holder, Donahoe,

Verizon Business Services, Verizon Wireless, Verizon Virginia, and various

Unknown Named Agents of the U.S. Department of Justice ("DOJ") or U.S. Postal

Service ("USPS") violated the U.S. Constitution and federal and state statutes.

Specifically, the Attkissons allege that the Appellees conducted or facilitated

unauthorized electronic surveillance of the Attkissons' home and electronic

devices in response to appellant Sharyl Attkisson's investigative reporting

regarding the actions of the U.S. Government.

The Attkissons' constitutional claims, brought pursuant to *Bivens v. Six

Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), were

first raised in a Complaint filed in the Superior Court for the District of Columbia

and subsequently removed to the U.S. District Court for the District of Columbia

on February 18, 2015.  JA228-29.  In September 2015 the Attkissons filed a

separate Complaint raising a variety of federal and local statutory claims.  JA229.

In July 2016 the two complaints were consolidated into one civil action, and in

March 2017 the consolidated action was transferred to the United States District

Court for the Eastern District of Virginia.  *Id.*  After narrow discovery about the

Internet Protocol ("IP") address allegedly used for the surveillance, the Attkissons

filed an Amended Complaint on February 5, 2018.  JA526-66.

On September 22 and November 1, 2017, the District Court granted

Defendants' Motion to Dismiss as to some of the Attkissons' claims, JA155;

JA244, and on May 15, 2018 the District Court granted Defendants' Motion to

Dismiss with regard to the remaining claims (and also refused to grant the

Attkissons leave to amend their Complaint), JA668-69, thus creating a final

appealable judgment.  The Attkissons hereby appeal the November 1, 2017, and

May 15, 2018, Orders of the District Court.

## STATEMENT OF FACTS

Appellant Sharyl Attkisson is a veteran investigative journalist who worked for CBS News for twenty years.  JA121-22.  On February 22, 2011, *Fast and Furious*, one of Ms. Attkisson's investigative reports, aired on CBS.  JA122.  This report exposed a federal gun-trafficking investigation that contributed to the death of one U.S. Border Patrol Agent and the death or maiming of 150 Mexican civilians.  *Id.*

Despite corroboration of Ms. Attkisson's work from both domestic government employees and at least one foreign government official, the Bureau of Alcohol, Tobacco, and Firearms ("ATF") immediately instigated a smear campaign against Ms. Attkisson.  JA121-23; JA141-42.  Even more significantly, officials from the U.S. DOJ and ATF took active steps to identify Ms. Attkisson's government sources.  JA123.  Undeterred, Ms. Attkisson continued her journalistic activities, again using confidential government informants to report on the controversial 2012 attacks on two U.S. government facilities in Benghazi, Libya.  JA127.

Shortly after Ms. Attkisson's *Fast and Furious* reports began airing, she, her husband, and her daughter noticed with growing concern that their electronic devices, all connected to the family's Verizon FiOS account, began to malfunction and exhibit extremely strange behavior.  JA124.  For example, Ms. Attkisson's

work Toshiba laptop computer as well as the family's Apple desktop computer, would turn on and off at night without input from anyone in the household. *Id.* In addition, the house alarm began "chirping" daily at different times, suggesting "phone line trouble," even though the phone line was working. *Id.* The family also experienced television interference problems, and Ms. Attkisson's phones became nearly unusable because of anomalies and interruptions. JA124-26; JA128. Ms. Attkisson repeatedly contacted Verizon about the problems over two years and installed new routers, but the issues continued. JA124; JA126.

Although one would normally assume that such problems merely resulted from mechanical and technical glitches, several sources with close ties to the intelligence community approached Ms. Attkisson privately and informed her that the government was likely monitoring her electronically to identify her confidential sources, and also to track her investigative reporting on the *Fast and Furious* and *Benghazi* stories. JA127-28.

In December 2012 a contact of Ms. Attkisson's with U.S. Government intelligence experience conducted a search of the exterior of the Attkissons' house and discovered an extra fiber optics cable coming from the Attkissons' Verizon service box. JA129. Ms. Attkisson notified Verizon, but Verizon denied knowing anything about the extra cable and advised Ms. Attkisson to contact law enforcement. *Id.* Yet, a person purporting to be a Verizon employee subsequently

called Ms. Attkisson to insist that a technician come to her house on New Year's Day to inspect the cable. *Id.* Despite Ms. Attkisson's protestations, the purported Verizon employee insisted on the inspection. *Id.* Ms. Attkisson relented, but requested that the extra fiber optics line be left at her home as potential evidence. *Id.* However, after the inspection was complete, the extra cable disappeared, and the supposed Verizon technician never returned Ms. Attkisson's subsequent calls. JA129-30.

In January and February 2013 the Attkissons continued to experience major phone and internet usage disruptions, including drop-offs, noises, and other interference. JA130. Verizon was notified, and technicians and supervisors made additional contacts and visits. *Id.*

On January 8, 2013, Ms. Attkisson delivered her CBS Toshiba laptop for examination by a specialist with expertise in government computer forensics. *Id.* The next day, the specialist reported to Ms. Attkisson that the CBS Toshiba laptop showed clear evidence of outside, highly-sophisticated, unauthorized remote "intrusions." *Id.*

On January 10, 2013, the CBS Toshiba laptop was returned to Ms. Attkisson, and she was provided a report from the specialist. *Id.* According to the report, sophisticated software had been used to accomplish the remote intrusions, the attack was initiated from an IP address owned and operated by the federal

government, and the software fingerprint revealed that the software was proprietary to the federal government. *Id.* The intrusion included, among other surveillance: keystroke monitoring, exfiltration of data, audio surveillance of the Attkissons' conversations and activities at home by activating Skype, mining personal passwords, monitoring work and personal email, and the probable compromise of the Attkissons' work and personal smartphones. *Id.* According to the report, the surveillance by the identified software spanned most of 2012 at least. *Id.* The report also stated that the intruders had accessed CBS network systems in Washington, and that the perpetrator had placed three classified documents deep in the computer's operating system. *Id.* Ms. Attkisson immediately notified her direct supervisor at CBS News of the laptop intrusion and findings. JA130-31.

On February 2, 2013, an independent forensic computer analyst retained by CBS News spent approximately six hours at the Attkissons' home, during which time he reported finding evidence on both Ms. Attkisson's CBS Toshiba laptop and personal Apple desktop computers of a coordinated, highly-skilled series of unauthorized, remote actions and attacks directed at the operation of the computers and the storage and access of data on them. JA131. CBS engaged the company to conduct even more analysis of the Toshiba laptop. *Id.* Ultimately, the cyber security firm hired by CBS confirmed that there had been a highly sophisticated

intrusion into Ms. Attkisson's computer in 2012, as well as remote actions in

December 2012 to delete all evidence of the intrusion.  JA131-32.

In sum, multiple forensic experts analyzed the Attkissons' computers and

other electronic devices and concluded:

- In February 2012, an unauthorized party or parties had remotely installed sophisticated surveillance spyware on Ms. Attkisson's CBS Toshiba laptop.  JA124.

- The Attkissons' computer systems had been targets of unauthorized surveillance efforts, including prolonged ongoing surveillance of the family's desktop computer, beginning as early as June 2011.  JA125.

- The Attkissons' Blackberry mobile phones had likewise been surveilled when those phones were attached to the family's desktop computer.  *Id.*  Records revealed that a file recovery process had been performed by an intruder that transferred large numbers of records off the BlackBerry.  *Id.*

- Unauthorized changes had been made to the Attkissons' Virtual Public Network ("VPN") settings; these changes were consistent with unauthorized surveillance activities.  *Id.*

- An "smbclient" command had been issued to the Attkissons' desktop computer, indicating that the computer had been commandeered as a network resource, thereby creating an opportunity for remote surveillance of the contents of the computer.  *Id.*

The forensic evidence revealed that, as a result of these various intrusions, an

unauthorized outsider likely gained access to emails, personal files, Internet

browsing history, passwords, execution of programs, financial records, and
photographs of Ms. Attkisson and her family.  *Id.*

Even more troubling, information recovered directly from the Attkissons'
computers revealed that remote communication with their system was executed
through an IP address owned, controlled, and operated by the USPS, even though
that IP address was not associated with any web server or website officially on
record as one used by the USPS.  *Id.*  And while it may at first seem odd that the IP
address would have anything to do with the USPS, audits subsequently performed
by the U.S. DOJ Office of Inspector General reveal that the USPS, under the
personal direction of appellee Patrick Donahoe, often collaborated with the Federal
Bureau of Investigation ("FBI"), Department of Homeland Security ("DHS"), and
DOJ on domestic surveillance investigations.  JA134; JA137.

Significantly, a detailed forensic analysis revealed the referenced USPS IP
address was used to open a **hidden communications channel into the Attkissons'
computer system, establishing beyond doubt that an unidentified person using
a federal government IP address was secretly communicating directly with the
Attkissons' computer system on an ongoing basis.**  JA125-26.

In March 2013 Ms. Attkisson's Apple desktop computer began
malfunctioning and, after several days of it freezing and emitting a burning odor, it

shut down.  JA131.  Ms. Attkisson was unable to turn the Apple computer back on after this event.  *Id.*

On June 11, 2013, CBS News issued a brief public statement, based on the forensics report by its independent expert, confirming that Ms. Attkisson's computer had been accessed by an unauthorized, external, unknown party on multiple occasions in late 2012 and that the party used sophisticated methods to try to remove all possible indications of unauthorized activity.  JA131-32.

These various electronic intrusions caused the Attkissons to incur unreasonable and unnecessary expenses to diagnose and correct the resulting problems; invaded their personal and family privacy; caused them to fear for their individual and family's well-being and safety; interfered with their ability to use their telephones, computer, and television; caused Ms. Attkisson fear for her sources' well-being and safety; interfered with her ability to maintain necessary contacts with sources to perform her professional investigative reporting duties as a member of the press; affected her sources' willingness to communicate with her; and directly interfered with her duties as an investigative reporter.  JA134.

The Attkissons filed their original Complaint against Defendants Holder, Donahoe, and various John Doe federal agents, in their individual capacities, in the Superior Court of the District of Columbia on December 30, 2014.  JA228. Defendants removed the lawsuit to the United States District Court for the District

of Columbia on February 18, 2015.  JA228-29.  On September 2, 2015, Ms.

Attkisson filed a second Complaint in the same federal court.  JA229.  These two

complaints were consolidated, and on September 18, 2017, a single Consolidated

Complaint, containing eight separate causes of action against Holder, Donahoe,

and John Does, was transferred to the United States District Court for the Eastern

District of Virginia.  *Id.*

        By orders of the District Court on September 22, 2017 and November 1,

2017, several counts were dismissed.  JA155; JA244.  On September 25, 2017, the

District Court approved a Joint Discovery Plan with regard to the claims that had

not been dismissed, JA160, but the Government took the position that no discovery

concerning the John Doe defendants was permissible.  JA156, n.1.  In addition, just

over one month later, on October 27, 2017, the Government moved for a Protective

Order as well as for Reconsideration of its earlier Motion to Dismiss.  JA192.

        The Attkissons thus were unable to pursue any discovery related to the

identity of the John Does and were instead only able to take one deposition, of

USPS' representative Cliff Biram, Jr.  Dep. Cliff Biram, Jr. 1.  Mr. Biram revealed

that, during the relevant time period (2011-2014), the USPS had contracted with

Verizon (among others) to provide a variety of telecommunications network

services.  *Id.* at 136:4-137:22.  Mr. Biram also provided information that allowed

the Attkissons' forensic analysts to identify several Verizon-affiliated IP addresses

that were the pathways by which the cyber-intrusion and surveillance took place. JA550.

Based on this new information, the Attkissons filed their First Amended Consolidated Complaint on February 5, 2018, naming MCI Communications Services, Inc., Cellco Partnership, and Verizon Virginia, LLC (collectively "Verizon"). JA526. Yet, on May 15, 2018, the District Court refused to grant leave to amend the Complaint, JA668, while granting Defendants' Motions to Dismiss on all counts, JA669, leading to this appeal.

## SUMMARY OF ARGUMENT

Although the procedural history of this suit has been complex, the Attkissons in this appeal raise only a narrow set of issues and claims.

First, the Attkissons' Fourth Amendment *Bivens* claims against Defendants Holder, Donahoe, and John Does are cognizable. At its core, the Attkissons' Fourth Amendment claim is simply a *Bivens* claim for the digital era. In *Bivens* the complaint at issue alleged that a group of unidentified FBI agents, acting under claim of federal authority, entered an apartment and conducted a warrantless search without probable cause. Similarly, the Attkissons contend that a group of unidentified federal agents, likewise acting under federal authority, entered their computer systems through electronic means and conducted warrantless surveillance. Thus, the claims at issue are just as serious as in *Bivens*, if not more so, and they fit squarely within the *Bivens* framework, breaking no new legal ground.

The U.S. Supreme Court's recent decision in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), emphatically reaffirmed that *Bivens* and cases like it remain good law and that complaints raising individual *Bivens*-like claims for monetary damages remain cognizable. And although *Ziglar* refused to extend *Bivens* to new contexts, none of the concerns animating *Ziglar* are present here. First, *Ziglar* was a large-scale challenge to U.S. detention policy on behalf of hundreds of inmates. Second,

the complaint in *Ziglar* implicated core national security policies instituted at the highest levels of the U.S. Executive Branch after the terrorist attacks on September 11, 2001. Third, the *Ziglar* complaint sought broad-based institutional reform through an injunction that would change U.S. detention policy. In contrast, this suit is brought by one family concerning one surveillance incident seeking only monetary damages to remedy a clearly defined violation of an established constitutional right to be free from warrantless government searches.

Second, the Attkissons' Complaint states a valid cause of action for a violation of the Electronic Communications Privacy Act ("ECPA") against Defendants Holder, Donahoe, John Does, and Verizon because they either intercepted, endeavored to intercept, or procured others to intercept electronic communication in violation of 18 U.S.C. § 2511(1)(a) (2012). Indeed, Section 2520 of the statute, as amended in 1986, provides a private right of action for violations of Section 2511: "[A]ny person whose wire, oral, or electronic communication is intercepted . . . in violation of this chapter may in a civil action recover from the person or entity which engaged in that violation such relief as may be appropriate." 18 U.S.C. § 2520 (2012).

There is no dispute that the ECPA provides the Attkissons a cause of action against those who may have directly conducted surveillance operations on their computer systems. But with regard to those defendants who might have procured

others to conduct the surveillance, the District Court wrongly interpreted the amended version of Section 2520 to have effectuated a major change in the statutory scheme by eliminating explicit mention of the word "procure." According to the District Court, even though Section 2511 still makes it a clear statutory violation to procure another person to intercept electronic communications, the amended Section 2520 has somehow now made it impossible to vindicate such procurer liability through a private right of action. This odd interpretive leap ignores basic principles of statutory construction and is not justified by any indication that Congress intended to make such a fundamental change to the ECPA. The Attkissons thus have cognizable claims against both those actively engaged in the surveillance activities and those who procured others to do so.

Third, assuming any of the *Bivens* and ECPA claims are cognizable (and again there is no dispute that at least some of the ECPA claims are cognizable under the statute), the Attkissons' Consolidated Complaint sets forth sufficient factual allegations against defendants Holder, Donahoe, and John Does to satisfy Federal Rule of Civil Procedure 8 and therefore survive a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6). The Complaint provides many pages of specific factual detail, including forensic analysis, that establish a secret, illegal intrusion into the Attkissons' computer systems, traceable to government actors,

during a time when it is undisputed that government officials took numerous

actions to try to crack down on leaks of information to investigative journalists

such as Ms. Attkisson.  These factual allegations, which at the Complaint stage

must be taken as true, easily surpass the threshold for overcoming a motion to

dismiss under Rule 12(b)(6).  And although the District Court dismissed the

Attkissons' claims against the John Doe federal agents because the Attkissons have

not yet been able to name them, there is no question that an ECPA claim against

them would be cognizable.  Information regarding the identity of such agents is

uniquely in the hands of the federal government, and the Attkissons have not yet

been able to pursue full or adequate discovery to determine the details of the

surveillance operation or the personnel involved.  Thus, dismissal at this

preliminary stage is inappropriate.

Fourth, because the factual basis for the Attkissons' claims against Verizon

was only discovered after the initial pleading stage had been completed, the

Attkissons attempted to file an Amended Complaint that, among other things,

added Verizon as a party.  However, the District Court abused its discretion in not

granting them leave to amend under Federal Rule of Civil Procedure 15(a)(2).  The

Attkissons' Amended Complaint was not filed in bad faith because it was a direct

result of the discovery process itself and the Court's own scheduling order.  In

addition, allowing the Amended Complaint would not prejudice Verizon because

only limited discovery had been conducted, and the Motion for Leave to Amend was made before the case was even set for trial.  Finally, the new ECPA claim against Verizon alleged a valid, non-frivolous cause of action with factual detail sufficient to satisfy Federal Rule of Civil Procedure 8.  Accordingly, denying leave to amend was an abuse of discretion.

## ARGUMENT

### I.  STANDARD OF REVIEW

The District Court's determination that the Attkissons' *Bivens* claims are not

cognizable pursuant to *Ziglar* is a pure question of law that is reviewed *de novo*,

with no deference given to the District Court.  *See, e.g.*, *Covey v. Assessor of Ohio

County*, 777 F.3d 186, 191-92 (4th Cir. 2015).  Likewise, the District Court's

interpretation of the ECPA is a question of statutory interpretation, which this

Court also reviews *de novo*.  *See, e.g.*, *Stone v. Instrumentation Lab. Co.*, 591 F.3d

239, 242-43 (4th Cir. 2009).

The District Court's determination that the Attkissons did not plead

sufficient facts to state a claim under Federal Rule of Civil Procedure 8(a) is

reviewed *de novo* as well.  *See Woods v. City of Greensboro*, 855 F.3d 639, 646

(4th Cir.), *cert. denied sub nom. City of Greensboro v. BNT Ad Agency, LLC*, 138

S. Ct. 558 (2017).  Moreover, when reviewing a motion to dismiss under Federal

Rule of Civil Procedure 12(b)(6), a court must accept as true all facts of the

complaint and construe them in the light most favorable to the plaintiff.  *Id.* at 648-

49, 653.  Thus, "a plaintiff is not required to plead factual allegations in great

detail," *Nanni v. Aberdeen Marketplace, Inc.*, 878 F.3d 447, 452 (4th Cir. 2017)

(citing *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 256 (4th

Cir. 2009)), *cert. denied*, 138 S. Ct. 2657 (2018), and the sole question on a motion

to dismiss is whether the factual content of the complaint, when "consider[ing] the entire course of events," leads to reasonable inferences of the defendant's misconduct.  *Tobey v. Jones*, 706 F.3d 379, 386 (4th Cir. 2013).

Finally, the District Court's refusal to allow the Attkissons to amend their Complaint is reviewed for abuse of discretion.  *See Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 112 (4th Cir. 2013).  This Court has made clear its "policy to liberally allow amendment in keeping with the spirit of Federal Rule of Civil Procedure 15(a)."  *Galustian v. Peter*, 591 F.3d 724, 729 (4th Cir. 2010).  Thus, a district court abuses its discretion when it refuses to grant leave to amend the complaint in the absence of prejudice, bad faith, or futility.  *E.g.*, *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509-10 (4th Cir. 1986).

## II.    DISCUSSION OF ISSUES

### A.    The Attkissons' *Bivens* Claim Under the Fourth Amendment Is Cognizable Because Their Complaint Alleges An Unlawful Warrantless Search By Government Agents, Just Like *Bivens* Itself.

At its core, the Attkissons' claim that the government Defendants violated the Fourth Amendment of the United States Constitution is simply a *Bivens* claim for the digital era.  In *Bivens* the complaint at issue alleged that a group of unidentified FBI agents, acting under claim of federal authority, entered an apartment and conducted a warrantless search without probable cause.  *Bivens*, 403 U.S. at 389.  The U.S. Supreme Court allowed the plaintiff to recover damages from the responsible federal officials, holding that the Fourth Amendment "guarantees to citizens of the United States the absolute right to be free from unreasonable searches and seizures carried out by virtue of federal authority" and that monetary damages may be obtained for violations of that guarantee.  *Id.* at 392.

The Attkissons' Complaint is fundamentally identical.  Here, the Attkissons contend that a group of unidentified federal agents, likewise acting under federal authority, entered their computer systems through electronic means and conducted warrantless surveillance in violation of the Fourth Amendment.  Accordingly, the claim here is just as serious as in *Bivens*, if not more so, and it fits squarely within the *Bivens* framework, breaking no new legal ground.  Thus, there is no reason not

to allow the Attkissons' claim to at least move forward to the discovery phase. Certainly, the allegations in the Complaint, if true, state an obvious violation of *Bivens* that remains cognizable under clear Supreme Court precedent.

### 1. The U.S. Supreme Court In *Ziglar* Recently Reaffirmed The Continuing Viability Of *Bivens* Claims.

In *Ziglar* the U.S. Supreme Court made it absolutely clear that *Bivens* and cases like it remain good law and that complaints raising individual *Bivens*-like claims for monetary damages remain cognizable. Indeed, it is difficult to imagine how the Court could have been more explicit that *Bivens* remains good law. The Court tackled the question head-on, stating firmly that "this opinion is not intended to cast doubt on the continued force, or even the necessity, of *Bivens* in the search-and-seizure context in which it arose." *Ziglar*, 137 S. Ct. at 1856. According to the Court, "[t]he settled law of *Bivens* in this common and recurrent sphere of law enforcement, and the undoubted reliance upon it as a fixed principle in the law, are powerful reasons to retain it in that sphere." *Id*. at 1857.

Thus, although *Ziglar* resisted efforts to *extend* the *Bivens* remedy beyond its core contexts, there can be no doubt that search and seizure lawsuits under *Bivens* remain available. *See Rodriguez v. Swartz*, No. 15-16410, 2018 WL 3733428, at *9 (9th Cir. Aug. 7, 2018) (recognizing that the *Ziglar* Court "went out of its way to emphasize" the continuing vitality of *Bivens* in the search-and-seizure context), *stay granted*, 2018 U.S. App. LEXIS 22710 (9th Cir. Aug. 15, 2018). The *Ziglar*

Court made clear that in claims involving search and seizures, *Bivens* provides useful "instruction and guidance to federal law enforcement officers." *Ziglar*, 137 S. Ct. at 1857. Particularly given the sheer number of searches that law enforcement authorities conduct, such guidance—and a remedy for overreach—are essential.

A *Bivens* remedy for unlawful searches has become even more important in an era of electronic surveillance. Indeed, if part of the purpose of *Bivens* is to provide "instruction and guidance to federal law enforcement officers," such instruction and guidance is especially needed as those authorities have amassed radically expanded toolkits for conducting remote searches through electronic means.[2] *Id.* at 1857. Thus, a claim such as the one raised by the Attkissons is a necessary, fact-bound application of *Bivens* that effectuates the essence of Fourth Amendment values in the digital arena.

### 2. None Of The Concerns Animating *Ziglar*'s Refusal To Extend *Bivens* Is Present In This Case.

Although *Ziglar* disfavors *extending Bivens* claims to novel contexts, the Attkissons' claims do not raise the sorts of concerns the *Ziglar* Court identified. In

---

[2] For that reason, there is certainly no basis for refusing to allow *Bivens* suits just because the government search is electronic rather than physical. *Cf, e.g.*, *Gustafson v. Adkins*, 803 F.3d 883, 886 (7th Cir. 2015) (permitting a *Bivens* action to proceed in a case alleging that a governmental official's installation of covert video surveillance equipment constituted an unconstitutional search).

particular, the Court denied the heart of the plaintiff's claim in *Ziglar* because, in three fundamental ways—none of which applies here—the *Ziglar* complaint would have impermissibly extended *Bivens*.

First, the complaint in *Ziglar* was not a suit brought by a single individual regarding a single incident, as in *Bivens*. Instead, it was a large-scale challenge to U.S. detention policy on behalf of hundreds of inmates. Because of the large-scale nature of the complaint, the Court worried that "the discovery and litigation process would either border upon or directly implicate the discussion and deliberations that led to the formation of the policy in question." *Id.* at 1860. According to the Court, allowing such a suit "would require courts to interfere in an intrusive way with sensitive functions of the Executive Branch." *Id.* at 1861.

Second, the complaint in *Ziglar* implicated core national security policies instituted at the highest levels of the U.S. Executive Branch after the terrorist attacks on September 11, 2001. *Id.* at 1860. As the *Ziglar* Court made clear, "respondents' detention policy claims challenge the confinement conditions imposed on illegal aliens pursuant to a high-level executive policy created in the wake of a major terrorist attack on American soil." *Id.* Thus, allowing a *Bivens* claim challenging these policies would necessarily involve the Judicial Branch in a review of fundamental discretionary U.S. Executive Branch national security decisions. Given the significant separation-of-powers concerns that a *Bivens*

action would create in this context, the *Ziglar* Court refrained from expanding

*Bivens* in such a broad review of detention policy.  As the Court stated, the

complaint challenges "major elements of the Government's whole response to the

September 11 attacks, thus of necessity requiring an inquiry into sensitive issues of

national security."  *Id.* at 1861.

Third, the *Ziglar* complaint sought broad-based institutional reform through

an injunction that would change U.S. detention policy.  In contrast, Bivens had

sought only monetary damages on behalf of one individual to remedy a clearly

defined violation of an established constitutional right.

The Fourth Circuit has not yet interpreted *Ziglar*, and to date there are no

federal court of appeals decisions applying *Ziglar* to a suit alleging an

unconstitutional search as in this case.  However, the Ninth Circuit recently went

so far as to find that even *extending Bivens* to new contexts is justifiable under

*Ziglar* if the claim concerns an "individual instance[ ] of . . . law enforcement

overreach," rather than a challenge to broader Executive Branch policies.

*Rodriguez*, 2018 WL 3733428, at *15 (quoting *Ziglar*, 137 S. Ct. at 1862); *see also*

*Lanuza v. Love*, No. 15-35408, 2018 WL 3848507, at *3, 12 (9th Cir. Aug. 14,

2018) (similarly distinguishing *Ziglar* and allowing a *Bivens* suit to proceed against

a government immigration lawyer who forged and submitted a document in an

immigration proceeding).

Likewise, at least some lower courts applying *Ziglar* have drawn precisely the distinctions described above.  Accordingly, discrete violations of clearly established rights that have previously been recognized as cognizable *Bivens* claims can still proceed, while broad claims seeking new changes to Executive Branch policy cannot.  For example, in *McLean v. Gutierrez*, an Eighth Amendment excessive force claim could proceed because it challenged "a single instance of misconduct rather than any high level policies."  No. 15-275-RGK, 2017 WL 6887309, at *18-19 (C.D. Cal. Sept. 28, 2017).  As the judge noted, quoting *Ziglar*, "[i]ndividual instances of misconduct 'due to their very nature are difficult to address except by way of damages actions after the fact.'"  *Id.* at *19 (quoting *Ziglar*, 137 S. Ct. at 1862).  Because the case presented "a relatively simple question of whether a federal official applied excessive force during his pat-down search against plaintiff," that claim could proceed.  *Id.*

Similarly, in *Jerra v. United States*, which also raised an excessive force claim against prison guards, the district court recognized that *Ziglar* should not foreclose the *Bivens* claim.  No. 2:12–cv–01907–ODW, 2018 WL 1605563, at *6 (C.D. Cal. Mar. 29, 2018), *appeal filed sub nom. Jerra v. Magana*, No. 18-55678, 2018 WL 1605563 (9th Cir. May 25, 2018).  The court observed that the claims at issue "involve[d] two individual officers, and their individual actions—not large-scale government policies."  *Id.*  The claims also did "not implicate national

26

security, executive policy, or the other largely political concerns addressed

in *Ziglar*." *Id.* Finally, the claims asked for damages, rather than an injunction,

again distinguishing the case at issue from *Ziglar*. *Jerra*, 2018 WL 1605563, at

*5.[3]

As with *Rodriguez*, *Lanuza*, *McLean*, and *Jerra*, the Attkissons' claim

implicates no broad U.S. Executive Branch policy at all. Instead, the Attkissons

challenge an individual instance of governmental overreach committed by one or a

---

[3] The post-*Ziglar* federal appellate cases refusing to permit a *Bivens* suit to proceed
are all easily distinguishable from the Attkissons' suit. For example, the Fifth
Circuit declined to extend *Bivens* to a suit brought by a Mexican citizen for an
injury on Mexican soil. *See Hernandez v. Mesa*, 885 F.3d 811, 823 (5th Cir.),
*petition for cert filed*, No. 16-1678 (2018). The Third Circuit declined to extend
*Bivens* to a First Amendment claim against the Transportation Security
Administration ("TSA") because airport security implicates "split-second" national
security decisions and because Congress had limited the scope of judicial review
over TSA decisions. *See Vanderklok v. United States*, 868 F.3d 189, 207-08 (3d
Cir. 2017). The Second Circuit declined to extend *Bivens* to an Equal Protection
Clause claim brought by a military cadet because *Bivens* claims are especially
disfavored within the military context due to the special separation-of-powers
concerns that would arise if courts were to insert themselves into questions of
military discipline. *See Doe v. Hagenbeck*, 870 F.3d 36, 43-44 (2d Cir. 2017).
And other appellate courts have declined to extend *Bivens* to non-Fourth
Amendment contexts where other remedies were available. *See Liff v. Office of
Inspector Gen. for U.S. Dep't of Labor*, 881 F.3d 912, 919 (D.D.C. 2018) (holding,
in a suit brought by a government contractor, that "[t]he constellation of statutes
and regulations governing federal contracts" provided an adequate remedy, thereby
precluding a *Bivens* remedy); *González v. Vélez*, 864 F.3d 45, 53-54 (1st Cir. 2017)
(holding that federal sector employees could obtain relief through the
"comprehensive remedial network" of the Civil Service Reform Act and Title VII).
None of these decisions is apposite and none arises in the context of a government
search of a private U.S. citizen, which, like the Attkissons' claim, is the precise
scenario in *Bivens* itself.

small number of federal officials.  Certainly, if government officials infiltrated the

Attkissons' computer systems as alleged in the Complaint, and if the infiltration

occurred without a warrant or exigent circumstances, then a clear Fourth

Amendment violation took place.  In such circumstances, a successful *Bivens*

action would in no way involve the Judicial Branch in second-guessing large U.S.

Executive Branch policies as the *Ziglar* case would have.

In addition, the Attkissons' Complaint does not challenge broad issues of

U.S. national security policy, as *Ziglar* did.  Indeed, it is important to recognize

that this is *not* a case challenging the government's overall policy of trying to

identify or prosecute those who leak confidential governmental information.  Such

a claim, were it at issue, might well run afoul of *Ziglar*'s separation-of-powers

concerns by entangling the judiciary in a suit aiming to litigate a large-scale

discretionary policy decision.  Instead, the Attkissons' sole concern is the specific

infiltration of their computer systems to conduct warrantless surveillance.  That

infiltration, unless somehow justified, is simply an unconstitutional search; no

broad policy question need be resolved, and no large-scale national security

question is at stake.

Indeed, were this case to proceed to discovery, the only questions to be

litigated would be: (1) did government personnel infiltrate the Attkissons'

computer systems and conduct surveillance; and (2) if so, did the government

personnel obtain a warrant or face sufficient exigent circumstances to justify the warrantless search?  This is simply a fact-bound application of clearly established Fourth Amendment jurisprudence.  Thus, the resolution of this case would not in any way affect U.S. Executive Branch policy or national security.

Finally, the Attkissons, like the plaintiff in *Bivens*, seek monetary damages.  Thus, this is not an institutional reform case like *Ziglar* that asks for a broad change in U.S. Executive Branch policy going forward.  It simply asks for compensation for a specific governmental violation of clearly established Fourth Amendment rights.

The District Court below, in its *Ziglar* analysis, relied heavily on the fact that the Attkissons' Complaint names high-ranking government officials, rather than the lower-level FBI agents who were the defendants in Bivens itself.  JA235.  Yet, although it is true that the Attkissons' Complaint names the former heads of the DOJ and the USPS, those individuals are not being sued based on general policy decisions they may have made, but only to the extent that either or both individuals specifically ordered or permitted the unlawful infiltration of the Attkissons' computer systems.  Likewise, the John Does to be identified through the discovery process would not be officials laying out policy goals; they would only be those who actually ordered, authorized, or carried out the infiltration of the Attkissons' computer systems or the resulting surveillance activity.  Thus, although

the *Ziglar* Court noted that the rank of the defendants could be seen as a meaningful extension of *Bivens*, that would only be in a case like *Ziglar* itself, where the high-ranking officials made discretionary policy decisions that are essentially being second-guessed through litigation.  Here, no such policy decisions are at issue.[4]

Finally, the District Court relied in part on the possible existence of other statutory remedies as a reason not to permit the Attkissons' *Bivens* claim to proceed.  JA236.  And while it is true that *Ziglar* noted that those plaintiffs might have other avenues to address their detention claims, here, the only likely alternative statutory claims are under the ECPA or the Federal Tort Claims Act ("FTCA").  As to the ECPA claims, it is worth noting, as explained below, that the District Court dismissed the Attkissons' ECPA claims as well, so it is disingenuous to say that the ECPA provides a viable alternative.  As to the FTCA claims—which the District Court also dismissed—the U.S. Supreme Court has explicitly rejected the idea that the FTCA constitutes a viable substitute for *Bivens*.  In *Carlson v. Green*, the Court held that "the *Bivens* remedy, being recoverable against individuals, is a more effective deterrent than the FTCA remedy against the United States."  446 U.S. 14, 15 (1980).  The Court also noted that it was "'crystal clear'

---

[4] In addition, even if this Court were to decide that the claims against Holder and Donahoe are an extension of *Bivens* and thus blocked by *Ziglar*, the claims against the John Does should still proceed.

that Congress intended the FTCA and *Bivens* to serve as 'parallel' and 'complementary' sources of liability." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001) (quoting *Carlson*, 446 U.S. at 19-20). Because *Ziglar* explicitly approved *Carlson* as good law, *Ziglar*, 137 S. Ct. at 1855, it is difficult to see how the possible existence of an FTCA claim could possibly constitute a reason under *Ziglar* to deny a *Bivens* cause of action.

In short, the Attkissons' Complaint simply presents a specific fact-bound application of clearly established Fourth Amendment jurisprudence. Nothing about the case extends *Bivens* to a novel context nor does the Complaint implicate the sort of separation-of-powers concerns that animated *Ziglar*. Further the Attkissons seek only monetary damages arising from a particular infiltration of their computer systems. No broader injunction or institutional reform is sought. Thus, this is at heart essentially the same suit as *Bivens* itself: if government officials infiltrated private citizens' computer systems to conduct surveillance without a warrant or any other legal justification, then those officials have clearly conducted an unlawful search in violation of the Fourth Amendment, and damages are justified.[5]

_____

[5] Because such warrantless domestic surveillance would clearly violate the Fourth Amendment, any claimed defense on qualified immunity grounds is wholly unjustified on the facts of this case. *See, e.g.*, *Gennusa v. Canova*, 748 F.3d 1103, 1113 (11th Cir. 2014) ("It has long been clear that even in sensitive cases involving

**B.    The Attkissons' Complaint States A Valid Cause Of Action For A Violation Of The ECPA, Both By Those Defendants Who Infiltrated The Attkissons' Computer Systems And By Those Who Procured Others To Do So.**

The Attkissons' Complaint painstakingly details the voluminous forensic evidence documenting an unauthorized infiltration of their computer systems, as well as ongoing surveillance of their various electronic devices.  This forensic analysis strongly suggests that the culprit is likely one or more government officials, perhaps working in coordination with private actors.  The Complaint therefore appropriately alleges a violation of the ECPA, both by those defendants who infiltrated the Attkissons' computer systems and by those who procured others to do so.

The District Court dismissed the ECPA claims against defendants Holder and Donahoe (and presumably any other defendant who procured others to commit the alleged computer infiltration).  The District Court reasoned that the ECPA provides only a cause of action against those who *directly* engage in the unauthorized interception, disclosure, or use of electronic information and not those who *procure others* to do the interception, disclosure or use.  This Section

_____

domestic threats to national security law enforcement officials need a warrant before electronically intercepting private communications.") (citing *Mitchell v. Forsyth*, 472 U.S. 511, 531-34 (1985) and *United States v. U.S. Dist. Court for the E.D. of Mich.*, 407 U.S. 297, 318-21 (1972)).  But, in any event, the District Court never reached the question of qualified immunity, and neither should this Court until the issue can be litigated below.

explains why the District Court's interpretation of the ECPA is wrong based on both statutory interpretation and Congress' legislative purpose.  But before doing so, it is worth emphasizing that nothing in the District Court's ECPA discussion so much as questions the viability of an ECPA claim against any of the John Doe defendants who *directly engaged* in the unlawful infiltration and surveillance of the Attkissons.  Therefore, *regardless* of how this Court decides the statutory interpretation question about procurer liability discussed below, the Attkissons' ECPA claims against the John Does should be allowed to survive a motion to dismiss and proceed to discovery.[6]

> **1. There Is No Dispute That, As Originally Drafted, The ECPA Provided An Explicit Private Right Of Action Against Both Direct Violators And Procurers.**

Section 2511(1)(a) of the ECPA makes it unlawful to "intentionally intercept[ ], endeavor[ ] to intercept, or procure[ ] any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication . . ."  18 U.S.C. § 2511(1)(a).  Thus, three kinds of activities are subject to liability under Section 2511(1)(a): (1) *intercepting* any wire, oral or electronic communication; (2) *endeavoring* to intercept any wire, oral or electronic communication; and (3)

---

[6] It is also possible that Holder and Donahoe, if they went so far as to order their own subordinates to conduct the surveillance at issue in this case, might be directly engaging in an ECPA violation, with no need to consider procurer liability at all.

*procuring* another person to intercept or endeavor to intercept any wire, oral or electronic communication.

The procedures for recovering civil damages for violations of the ECPA are set forth in 18 U.S.C. § 2520. Prior to a 1986 amendment, Section 2520 provided:

> Any person whose wire or oral communication is intercepted . . . in violation of this chapter shall (1) have a civil cause of action against any person who intercepts . . . or procures any other person to intercept . . . such communications, and (2) be entitled to recover from any such person [damages, attorney's fees and costs].

Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, § 2520, 82 Stat. 197, 223 (1968). Thus, the statute explicitly named both the person who intercepts communications and the person who procures others to intercept communications as potential defendants in suits to recover civil damages under the ECPA.

### 2. The 1986 Amendments To The ECPA Made Cosmetic Changes To The Relevant Statutory Language, But Did Nothing To Alter The Core Statutory Scheme.

As amended in 1986, Section 2520 now provides, "[A]ny person whose wire, oral, or electronic communication is intercepted . . . in violation of this chapter may in a civil action recover from the person or entity which engaged in that violation such relief as may be appropriate." 18 U.S.C. § 2520.

The District Court interpreted this amended version of Section 2520 to have effectuated a major change in the statutory scheme. According to the Court, even though Section 2511 still makes it a clear statutory violation to procure another person to intercept electronic communications, the amended Section 2520 has somehow now made it impossible to *vindicate* this procurer liability through a private right of action. This odd interpretive leap ignores basic principles of statutory construction and is not justified by any indication that Congress intended to make such a fundamental change to the ECPA.

### a. The New Section 2520 Is Most Logically Read To Retain A Cause Of Action For Any Violation Of Section 2511.

Reading Sections 2511 and 2520 together, as amended, results in a clear integrated whole whose plain meaning would unquestionably retain a cause of action for any violation of Section 2511. Section 2511(1)(a) defines those individuals who violate the statute as: "any person who intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication . . . ." § 2511(1)(a). Meanwhile, Section 2520 permits "any person whose . . . electronic communication is intercepted, disclosed, or intentionally used *in violation of this chapter*" to pursue a civil action against "the person or entity, other than the United States, *which engaged in that violation.*" § 2520 (emphases added). Thus, the first part of Section 2520 describes the *plaintiff* in the civil ECPA suit, the person who

has suffered the violation (namely, any person whose communication is

intercepted, disclosed or used).  This clause defines the harm the plaintiff endured,

and therefore it would not make sense for this portion of the provision to refer to

how the *defendant* perpetrated that harm (for example by procuring the

interception of a communication.).  The first half of the provision thus does

nothing to limit who may be sued as a *defendant* under Section 2520.  It is the

second part of the provision that describes the defendant, and that portion of the

provision refers to the defendant as "the person or entity…which engaged in that

violation."

     So the real question is simply the following: is the procurer of an

interception someone who has "engaged in" a violation of Section 2511(1)(a)?

And the answer to that question must be yes.  As discussed above, Section

2511(1)(a) explicitly includes procurers as people violating the statute.  For these

reasons, Section 2520 allows aggrieved plaintiffs to sue such a violator.

     Not only is this reading of the statute the most natural way of understanding

how Sections 2511 and 2520 interact, but it is also the only reading consistent with

the broad remedial purpose of the statute.  It is a cardinal rule of statutory

construction that a statute must always be read as a whole in light of its greater

policy goals.  *E.g.*, *McCarthy v. Bronson*, 500 U.S. 136, 142-43 (1991) (holding

that the statute in question must be interpreted based in part on Congress' intent,

substantive language choices, and policy goals).  Here, the purpose of the ECPA is

to protect the privacy of individuals and to provide remedies for the violations of

this law.[7]  Thus, it would be odd indeed for Congress to suddenly, and without

explanation, remove an entire category of remedial liability connected to the

interception of electronic communication.  *See Lonegan v. Hasty*, 436 F. Supp. 2d

419, 428 (E.D.N.Y. 2006) ("[T]he more natural reading of the amended [ECPA]

shows no intent on the part of Congress to eliminate the private right of action for

procurement violations.").[8]

---

[7] *See, e.g.*, S. Rep. No. 99-541, at 5 (1986), *as reprinted in* 1986 U.S.C.C.A.N.
3555, 3559 (stating, "[T]he law must advance with the technology to ensure the
continued vitality of the fourth amendment.  Privacy cannot be left to depend
solely on physical protection, or it will gradually erode as technology advances.
Congress must act to protect the privacy of our citizens.  If we do not, we will
promote the gradual erosion of this precious right.").
[8] The Fifth Circuit has adopted the opposite reading of the statute, *see Peavy v.
WFAA-TV, Inc.*, 221 F.3d 158, 168-69 (5th Cir. 2000), ruling that the language of
Section 2520 explicitly limits private rights of action so that only those whose
wire, oral, or electronic communication is *intercepted, disclosed, or intentionally
used* "in violation of this chapter" can sue, and moreover they can only sue those
who act in violation of this particular clause in Section 2520, thereby excluding
procurers.  *See id.*  The Fifth Circuit thus reads the "in violation of this chapter"
language to refer not to the statute as a whole, but only to the sentence in Section
2520 that immediately precedes it.  *Id.*  This is an odd reading considering the
language of the provision at issue refers to the *entire chapter*, not just Section
2520.  Even more surprisingly, the Fifth Circuit went so far as to find this statutory
language to be both "plain" and "unambiguous."  *Id.* at 169.  Therefore, the court
declined even to consider the significant absence of any legislative history to
suggest that Congress intended such a substantive change.  Nor did the court
consider that its reading would thwart the clear remedial goals of the statute.
Accordingly, this Court should not place any persuasive weight on the Fifth
Circuit's misguided decision.

Viewed in this light, the more logical explanation for the alteration to Section 2520 is that it was merely a cosmetic change to streamline the statutory language. Instead of the cumbersome repetition, word for word, of the language already set forth in Section 2511, the new version of Section 2520 simply substitutes a blanket reference to Section 2511. Thus, any person who suffers a violation of Section 2511 can sue any person or entity which engaged in that violation. The statutory scheme is therefore a logical whole that effectuates the clear aim of the statute to remedy violations of privacy by electronic means.

> **b.  The Legislative History Is Devoid Of Any Indication That Congress Intended To Make A Major Substantive Change To The Statutory Scheme When It Amended Section 2520.**

Review of the legislative history supports the conclusion that Congress, in streamlining the language of Section 2520 through the blanket phrase "person or entity which engaged in that violation," did not, in so doing, intend to insulate procurers from civil liability. Although the Senate Report explains most of the statutory changes made in the 1986 ECPA amendment in meticulous detail, it is completely silent concerning the portion of Section 2520 at issue here, suggesting that the changes to that portion were cosmetic rather than substantive. *See* S. Rep. No. 95-797, at 26-27 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 3555, 3580-81 (discussing changes to the civil liability provisions of the Wiretap Act).

Indeed, longstanding U.S. Supreme Court and Fourth Circuit precedent warns courts *not* to conclude that a statutory amendment effects a substantive change in the law without an explicit indication from Congress that such a substantive change was intended.  In the oft-cited case of *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 227 (1957), the U.S. Supreme Court refused to find a substantive change in a statute in part because "the Revisers' Notes do not express any substantive change."  The Fourth Circuit, applying *Fourco*, likewise has ruled that if a statutory amendment is ambiguous, "it will not be inferred that Congress, in revising and consolidating the laws, intended to change their effect unless such intention is clearly expressed."  *Robert E. Lee & Co. v. Veatch*, 301 F.2d 434, 437 (4th Cir. 1961) (quoting *Fourco*, 353 U.S. at 227).

Thus, although the discussion above has already shown that the statute is most logically read to retain procurer liability, even if this Court decides that the amended statute is ambiguous, *Fourco* and *Veatch* firmly counsel against reading a major amendment into a statute in the absence of any congressional statement suggesting such a substantive amendment was intended.  There is, in short, no reason that the Attkissons should be blocked from pursuing their ECPA claims against either those who infiltrated their computer systems or those who procured others to infiltrate those systems.

**C.    The Attkissons' Complaint Provided Sufficient Factual Allegations Against Defendants Holder, Donahoe, And John Does To Survive A Motion To Dismiss On The Attkissons'** *Bivens* **And ECPA Claims.**

Under Federal Rule of Civil Procedure 8, a complaint is sufficient so long as it provides "a short and plain statement of the claim showing that the pleader is entitled to relief."  The U.S. Supreme Court has repeatedly made clear that the complaint "need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *E.g.*, *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Johnson v. City of Shelby*, 135 S. Ct. 346, 347 (2014) (ruling that plaintiffs' complaint was sufficient because it "stated simply, concisely, and directly events that, they alleged, entitled them to damages.").  Moreover, when evaluating a Rule 12(b)(6) motion to dismiss, "a judge must accept as true all of the factual allegations contained in the complaint." *Erickson*, 551 U.S. at 94.  Finally, the reviewing court must make "all reasonable inferences in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (quoting *Nemet Chevrolet, Ltd.*, 591 F.3d at 253).

Thus, to survive a motion to dismiss under Rule 12(b)(6), a plaintiff must only allege sufficient facts to render a legal claim for relief  "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570); *see e.g.*, *Twombly*, 550 U.S. at 570 (holding that the need for plausibility accords

with Rule 8(a)(2)'s threshold requirement of a "plain statement" entitling relief).

To determine plausibility, the U.S. Supreme Court has established a two-step

analysis in which the reviewing court first "identif[ies] pleadings that, because they

are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*,

556 U.S. at 679.  Second, once conclusory allegations are removed, the court

"should assume the[ ] veracity" of any remaining allegations and determine if,

together, they plausibly state a claim for relief.  *Id.*  Thus, the sole question on a

motion to dismiss is whether the factual content of the complaint, when

"consider[ing] the entire course of events," leads to reasonable inferences of the

defendant's misconduct.  *Tobey*, 706 F.3d at 386 (holding that the district court

erred in dismissing plaintiff's First Amendment claim because, despite a lack of

clear causation in the complaint, plaintiff's facts led to a reasonable inference of a

constitutional violation).  Accordingly, a court should not grant a motion to dismiss

unless a defendant can establish that (1) all the allegations relating to a specific

claim are completely conclusory, or (2) the remaining factual allegations, taken as

a whole, state no claim for relief.  *See Tobey*, 706 F.3d at 386-87; *see also Nanni*,

878 F.3d at 452 ("[T]o satisfy the plausibility standard, a plaintiff is not required to

plead factual allegations in great detail."); *Woods*, 855 F.3d at 648 (quoting

*Twombly*, 550 U.S. at 556) (holding that, under *Twombly* and *Iqbal*, plaintiff

"need not plead facts sufficient to establish a *prima facie* case," but need only

"allege sufficient 'factual matter (taken as true) to suggest' a cognizable cause of action.").

Applying these standards, it is clear that the Attkissons' Complaint[9] goes far beyond what is required to survive a motion to dismiss under any reading of Rule 8. The Attkissons provide specific factual details regarding the abnormal operation of their computers and related devices as well as the voluminous and detailed conclusions of sophisticated computer forensic analysts pointing to governmental intrusion and surveillance. Indeed, the Complaint clearly alleges facts showing that an illegal intrusion occurred and that the intrusion was directly traced back to the federal government by forensic evidence. When taken together and treated as true under the standard of Rule 12, these specific, factual allegations reasonably support the inference that the governmental defendants violated the Attkissons' Fourth Amendment rights as well as their rights under the ECPA.

The boilerplate admonishment that, in evaluating a motion to dismiss, all factual allegations in a complaint must be treated as true is especially important in a case such as this one, where there is little ability for the plaintiffs on their own to prove their claims—or even identify the specific government actors involved—

---

[9] For purposes of this Section, the Attkissons assume, without conceding, that the "Consolidated Complaint" filed on September 15, 2017 is, as the District Court ruled, JA222, n.2, the "operative complaint" here. However, the District Court's unwarranted refusal to grant the Attkissons' leave to amend their Complaint is addressed in Section D below.

without access to sufficient discovery.  Indeed, nearly all the evidence that the

Attkissons will ultimately need to prove their claims is currently in the hands of the

government.  Therefore, requiring the Attkissons to satisfy an overly burdensome

pleading requirement would effectively allow government officials to insulate

themselves from all accountability merely by withholding needed information and

then filing motions to dismiss to avoid ever having to disclose anything at all.  As

this Court has recognized, the burden on the Attkissons at this stage of the

litigation cannot be too heavy because "a plaintiff may only have so much

information at his disposal at the outset."  *Robertson v. Sea Pines Real Estate Cos.*,

679 F.3d 278, 291 (4th Cir. 2012).  Indeed, because most of the relevant evidence

in this case is *still* unavailable to them, all the Attkissons can be expected to

provide at this preliminary stage of the proceedings[10] is a set of plausible factual

allegations that (1) their computer systems malfunctioned, (2) the malfunctioning

was related to some outside infiltration and surveillance activity, and (3) the

infiltration is most likely traceable to government actors.

The Attkissons' Complaint provides numerous factual allegations on all

three of these points.  Significantly, these allegations are *not* merely legal

conclusions.  To the contrary, the Complaint documents in full detail, for thirty-

---

[10] Although this case was filed originally in December 2014, it was not transferred
to the Eastern District of Virginia until September 2017.  To date, the Attkissons
have only been able to conduct one deposition and only meager discovery.

nine pages, the history of events concerning the illegal surveillance on their

electronic devices as far back as April 2009 up until the filing of the first

Complaint in 2014.

To begin, the Complaint alleges that reporter Sharyl Attkisson produced a

series of investigative journalism pieces critical of the federal government. This

reporting relied in part on information she obtained from government whistle-

blowers. The Complaint also provides many factual details regarding the

Executive Branch's general concern about government employees leaking

information. And, more specifically, the Complaint alleges that several sources

with close ties to the intelligence community approached Ms. Attkisson privately

and informed her that the government would likely be monitoring her

electronically in an effort to identify her confidential sources, and also to track her

investigative reporting. JA127-28.

The Complaint also provides many examples of the erratic behavior of the

Attkissons' various computers, behavior that began shortly after the CBS reports at

issue began to air. These allegations too do not simply present legal conclusions,

such as "defendants tampered with plaintiffs' computer systems." Instead, the

Complaint lists instances of computers turning on and off on their own, alarm

systems connected to the wireless network making unexplained noises, drop-offs,

interference, connectivity issues, a computer completely self-destructing, and so

on.  JA124-26; JA131.  The Complaint also alleges that the Attkissons took many

steps to try to remedy the problem, including replacing their router twice, but that

none of these more conventional solutions was effective to remedy the problems.

JA124; JA126.

Perhaps most significantly, the Complaint contains a long and detailed

account of the expert conclusions of two computer forensic analyses conducted on

the Attkissons' various devices.  JA124-26; JA130-31.  Again, these analyses do

not offer mere legal conclusions.  Instead, they provide extensive factual

determinations that led these experts to conclude that the Attkissons' computer

systems had indeed been infiltrated and that unauthorized, remote, external

surveillance had definitely occurred.  The experts also concluded that remote

communication with the Attkissons' system was executed through an IP address

owned, controlled, and operated by the USPS, even though that IP address was not

officially associated with any web server or website used by the USPS.  JA124-26.

The Complaint also alleges that audits subsequently performed by the U.S. DOJ

Office of Inspector General reveal that the USPS, under the personal direction of

Defendant Donahoe, often collaborated with the FBI, DHS, and DOJ on domestic

surveillance investigations.  JA134; JA137.

Finally, according to the Complaint, the forensic analyses concluded that a

communications channel was in fact opened up between the referenced

government IP address and the Attkissons' computer system, establishing beyond
doubt that a person or persons affiliated with the U.S. Government was
communicating directly with the Attkissons' computer system on an ongoing basis.
JA124-26.

　　　　These factual allegations easily support a plausible inference that some
number of government officials conducted illegal and unconstitutional surveillance
activity.  Of course, the Attkissons cannot, at this preliminary stage, have access to
the information to prove definitively that any particular government official
engaged in the surveillance activity.  But as this Court has made clear in *Tobey*,
706 F.3d at 386, at the motion to dismiss stage, the plaintiff need not provide
proof, or even explicit factual allegations, to establish a direct causal link to a
particular defendant in order to plausibly state a claim for relief.  In *Tobey*, the
plaintiff sued the TSA for violating his First Amendment rights by having him
arrested for protesting procedures surrounding an airport search.  Even though
TSA officials technically have no power to effectuate an arrest and even though the
complaint did not specifically allege that the officials asked airport security to
arrest the plaintiff, this Court ruled that the complaint was sufficient to support a
reasonable inference that TSA agents contributed to the violation of the plaintiff's
rights.  According to the Court, allegations have facial plausibility "when the
plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Id.*

(quoting *Iqbal*, 556 U.S. at 679).

The Attkissons' Complaint provides far more factual detail suggesting

government involvement in unconstitutional behavior than the complaint in *Tobey*.

As discussed above, the Attkissons' Complaint provides:

- allegations concerning the Executive Branch's desire to conduct surveillance in order to track down leakers, JA126-27; JA140;

- allegations of abnormal behavior of the Attkissons' computers and other electronic devices, beginning right after the particular reports at issue were aired on CBS, JA124;

- allegations based on forensic analysis revealing that a remote entity gained access to the Attkissons' computers, JA124-26; and

- allegations, also based on forensic analysis, that the pathway by which this intrusion occurred was an IP address controlled by the U.S. Government.  JA124-26.

It is frankly difficult to imagine how any plaintiff could possibly have

provided *more* evidence of unconstitutional and illegal electronic surveillance

before discovery than the Attkissons have in their Complaint.  For these reasons,

there is absolutely no basis for dismissing the Attkissons' Complaint against the

John Doe federal agents who conducted or authorized the surveillance.

With regard to these John Does, the District Court offered no legal analysis

and scant justification for granting the Defendants' Motion to Dismiss.  The only

discussion provided by the District Court is a footnote, which reads in its entirety:

> Since 2014 when the plaintiffs' first complaint was filed, none of the
> John Doe defendants has been identified or served and plaintiffs have
> made no substantial progress in identifying them.  As such, the time
> has come to end this litigation against them as well and for this
> reason, the claims against them are also dismissed by this Order.

JA669, n.3.  With all due respect to the District Court, this is nonsense, both as a

factual and a legal matter.

        To begin, the court seems to admonish the Attkissons for failing to make

progress in identifying the John Doe defendants as if years were spent trying to do

so.  In fact, the Court fails to note that there was no discovery permitted from 2014

to late 2017 as the case essentially lay dormant for three years.  And it is

undisputed that, up to this point, the Attkissons have been permitted only to

conduct a grand total of one deposition, and even that one was only of a USPS

representative.  Moreover, it is the U.S. Government defendants who have sought

to block any further discovery by filing for a Protective Order and then a Motion to

Dismiss.  Filing such motions is entirely within the Defendants' rights, of course,

but it is hardly the Attkissons' fault that they have not yet been able to identify the

John Does.  After all, that is precisely why they need discovery.

        It is true, as the District Court noted, that this case was filed back in 2014,

but it is wrong to suggest that the Attkissons have somehow had the opportunity to

seek the identity of the John Does for the four years since then and therefore

should be punished for failing to do so.  To the contrary, although the original

complaint was filed in the District of Columbia courts in December 2014, the case was first removed to federal court and then it languished for two years until the district court transferred the case to the Eastern District of Virginia in September 2017.  After some claims had been dismissed by the District Court below, limited discovery was nominally allowed to begin, but the Government made it clear, even in the Joint Proposed Discovery Plan, that it would oppose any discovery regarding the John Does.  *See* JA156 n.1.  In addition, just over a month later the U.S. Government defendants filed for a protective order and for reconsideration of its previous Motion to Dismiss.  JA192.  Thus, despite the long aggregate elapsed time, there has effectively been *no* opportunity for discovery on the identity of the John Does.  Because the Attkissons' Complaint satisfies any possible formulation of Rule 8's pleading standard, at the very least this Court should reverse the District Court's dismissal of the Complaint against the John Does and remand so that discovery can truly begin.

The claims against defendants Holder and Donahoe are a closer call because the factual allegations in the Attkissons' complaint regarding their direct personal involvement is, of necessity, more attenuated.  Yet, without discovery, it is difficult to imagine how the Attkissons could possibly amass direct evidence of Holder's and Donahoe's involvement in the decision to infiltrate and conduct surveillance on the Attkissons' computer systems.  Indeed, this is precisely why the U.S.

Supreme Court has made clear that its decisions in *Twombly* and *Iqbal* do not create a heightened pleading standard and why plausible inferences are all that are required at this stage. *See, e.g.*, *Iqbal*, 556 U.S. at 678; *Twombly.*, 550 U.S. at 570; *Johnson*, 135 S. Ct. at 347; *see also Robertson*, 679 F.3d at 291 (holding that the burden on the plaintiff cannot be so stringent at the complaint stage because "a plaintiff may only have so much information at his disposal at the outset.").

And again, it is not as if the Attkissons' Complaint is simply a conclusory set of allegations without factual detail. The Attkissons provide factual allegations that Mr. Holder knew about Ms. Attkisson's investigative journalism work, JA138, communicated to colleagues that he was unhappy about her reporting, JA138-39, and was ultimately held in contempt of Congress for withholding documents relating to Ms. Attkisson's work. JA122; JA141-42. The Attkissons also allege that the unauthorized surveillance of Ms. Attkisson occurred within an important timeframe when Mr. Holder and the DOJ were conducting several additional investigations of journalists to crack down on whistleblowers and information leaks. Indeed, the Complaint alleges that Mr. Holder personally approved a search warrant on James Rosen, a Fox News investigative reporter. JA140. From these facts, it is plausible to infer that Mr. Holder's knowing and intentional approval would have been a necessary requisite to open a federal investigation into Ms.

Attkisson, given the similarity of her work to Mr. Rosen's and the fact that Mr.

Holder personally approved the investigation into Mr. Rosen. *Id.*

As for Mr. Donahoe, the Complaint alleges that at all times relevant to this

case, he was responsible for the U.S. Postal Inspection Service ("USPIS"), the law

enforcement arm of USPS, and was therefore in direct control of all procedures by

which the USPIS assisted other law enforcement agencies in conducting

surveillance. JA145. As discussed above, the Complaint also includes many

factual conclusions of the forensic analysis revealing that a USPS IP address was

the pathway through which the intrusion occurred. JA124-26. Given the high-

profile nature of this case, the fact that the alleged surveillance focused on

potential government whistleblowers, and the need for close inter-agency

coordination, it is certainly plausible to infer that Mr. Donahoe would have had

direct knowledge of the surveillance activities and indeed likely would have had to

approve all such activities. JA145.

Taken as a whole, the Attkissons' factual allegations against Mr. Holder and

Mr. Donahoe therefore lead to plausible inferences that both men knew about and

authorized the illegal and unconstitutional surveillance activities. Accordingly, the

District Court's order dismissing the Attkissons' *Bivens* and ECPA claims against

the various government defendants should be reversed.

**D.  The District Court Abused Its Discretion In Denying The Attkissons Leave To Amend Their Complaint To Add An ECPA Claim Against Verizon Because Plaintiffs' Amended Complaint Was Not Prejudicial To Verizon, Was Not Filed In Bad Faith, And Stated A Sufficient Non-Frivolous Cause Of Action Sufficient To Survive A Motion To Dismiss.**

Because of the Defendants' refusal, as discussed above, to acquiesce in any meaningful discovery regarding the identity of the John Does, the Attkissons were able to take only one deposition, of USPS' representative Cliff Biram, Jr.  Dep. Cliff Biram, Jr. 1.  Mr. Biram revealed that, during the relevant time period (2011-2014), the USPS had contracted with Verizon (among others) to provide a variety of telecommunications network services.  *Id.* at 136:4-137:22.  In addition, based on Biram's information, the Attkissons' forensic analysts were able to identify several Verizon-affiliated IP addresses that were the pathways by which the cyber-intrusion and surveillance took place.  JA550.

This was crucial information.  For the first time, it became clear that Verizon was not simply the unwitting network provider maintaining the systems through which the illegal intrusion and surveillance occurred.  Rather, Verizon was revealed to be an actual ongoing participant in the illegal activity.  Because Verizon was working for the USPS and because the IP addresses through which the intrusion took place mapped to Verizon, the government surveillance could not have taken place without Verizon's support.  Indeed, based on the information from the deposition as well as the subsequent additional forensic analysis

52

undertaken based on that information, the Attkissons' Amended Complaint was able, for the first time, to plausibly allege that Verizon employees would likely have had a direct pathway into the USPS network, as if they were USPS employees themselves. *Id.* This connection was an essential part of the success of the entire infiltration of the Attkissons' computer system.

Armed with this new information, the Attkissons filed a new complaint, styled Plaintiffs' First Amended Consolidated Complaint. JA526-66. This Complaint for the first time named Verizon as a Defendant, although Verizon was already aware of the case and had been involved in the preliminary discovery process. Although the new Complaint arose directly from the discovery process itself, the District Court, in its May 15, 2018, order dismissing the case, JA669, also denied the Attkissons leave to amend the Complaint. JA668. This was an abuse of discretion.

Federal Rule of Civil Procedure 15(a)(2) is clear that leave to amend a complaint, even after the initial filing period, "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). Moreover, the U.S. Supreme Court has emphasized that "this mandate is to be heeded." *Foman v. Davis,* 371 U.S. 178, 182 (1962). In *Foman,* the Court held that leave to amend a pleading should be denied only when: (1) the amendment would be prejudicial to the opposing party, (2) bad faith is evident on the part of the moving party, or (3) the amendment

would be futile. *Id.* And significantly, the Fourth Circuit has held that delay alone is insufficient reason to deny leave to amend. Rather, the delay must be accompanied by allegations of prejudice, bad faith, or futility. *E.g.*, *Oroweat Foods Co.*, 785 F.2d at 509-10; *see also Galustian*, 591 F.3d at 730 (ruling that "[i]t is this Circuit's policy to liberally allow amendments in keeping with the spirit of Federal Rule of Civil Procedure 15(a)."). Because the Attkissons' added claim against Verizon was based on information discovered after the initial pleading stage, was not prejudicial to the defendants, and alleged a sufficient, non-frivolous cause of action under *Twombly* and *Iqbal* standards, there was no basis for the District Court to reject the Amended Complaint.

1. **The Attkissons' Amended Complaint Was Based On Information Discovered After The Initial Pleading Stage And Thus Was Not Offered In Bad Faith Nor Was It Prejudicial To Verizon Because Only Limited Discovery Had Been Conducted And The Amended Complaint Was Filed Far In Advance Of Trial.**

The District Court wrongly prevented the Attkissons from amending their Complaint because it would cause delay and therefore might be "prejudicial to future defendants and would impair judicial economy." JA667-68. To begin with, delay alone is not a sufficient reason for a court to deny leave to amend. *E.g.*, *Oroweat Foods Co.*, 785 F.2d at 509-10. Instead, the amended complaint must also be offered in bad faith and must prejudice the defendant, which generally only "applies where the amendment is offered shortly before or during trial." *Id.* at 510.

54

Indeed, even in circumstances where there has been substantial delay, leave to amend should *still* be granted so long as the defendant is not prejudiced. *See, e.g.*, *Scott*, 733 F.3d at 118 (holding that denial of leave to amend was improper where the amended complaint did not allege an "entirely new" theory, even though the amendment was proposed three years after the original complaint was filed); *Edwards v. City of Goldsboro*, 178 F.3d 231, 242 (4th Cir. 1999) (reversing the district court's denial of leave to amend because even if there were unreasonable delay, allowing plaintiff to amend the complaint would not prejudice the defendants because the amended complaint merely added specificity to facts already known by defendants). And a proposed amendment is not prejudicial "if it merely adds an additional theory of recovery to the facts already pled and is offered before any discovery has occurred." *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (reversing district court's denial of plaintiff's motion to amend because defendants had not conducted significant discovery); *see Foman*, 371 U.S. at 182 (holding there was no prejudice where "the amendment would have done no more than state an alternative theory for recovery.").

Yet, even if undue delay, in and of itself, were sufficient justification for preventing plaintiffs from amending their complaints, here there was no unreasonable delay at all. The deposition of USPS representative Cliff Biram, Jr. took place on October 17, 2017. Based on the deposition testimony, the

Attkissons' forensic expert conducted additional investigation.  The testimony and the investigation together for the first time created a plausible basis to add Verizon as a defendant.  The Attkissons' Amended Complaint, adding Verizon, was filed just a few months later.  Thus, there is no indication at all that the Attkissons were delaying out of bad faith, in order to gain strategic advantage or prejudice Verizon.  Rather, the discovery process functioned as it so often does: it revealed new facts, which clarified the appropriate issues in dispute as well as the proper parties to the suit.

Finally, there is no plausible basis for finding prejudice to Verizon.  The Amended Complaint was filed before the Motion to Dismiss stage had concluded and thus far in advance of the general discovery process and even farther in advance of trial.  In addition, although Verizon had not previously been named as a party to the suit, the company was already aware of the suit and had been involved in the preliminary discovery process.[11]  *See, e.g.*, *Moore v. Dish Network, LLC*, Civil Action No. 3:13–CV–36, 2014 WL 2214714, at *3 (N.D.W. Va. May 28, 2014) (allowing plaintiff to amend the complaint to add a party based on

---

[11] Plaintiffs filed a Notice of Deposition of Verizon Security Assistance Team on November 27, 2017.  JA254-58.  In addition, at a subsequent Hearing on January 12, 2018, Verizon's counsel referred to the company's compliance with additional discovery requests in this case even prior to that Notice of Deposition.  *See* JA492.  Thus, it is clear that Verizon had long been aware of and at least somewhat involved in this case, though a non-party.

information gleaned through discovery in part because the added party had

previously been aware of the case).

The District Court's stated concern about prejudice to "future defendants" is

puzzling.  The Attkissons' Amended Complaint largely repeated the same factual

allegations and legal theories as in their previous Complaint.  Moreover, as

discussed above, the addition of claims against Verizon was based on newly

gathered information derived from the discovery process.  The Attkissons were not

somehow acting in bad faith by trying to hide facts from the defendants in order to

spring it on them later to gain an unfair tactical advantage.  To the contrary, as

soon as new facts were uncovered, they immediately attempted to amend the

Complaint in order to provide fair notice and minimize any possible prejudice.

Thus, there is no reason to think that either Verizon or any other hypothetical

future defendants would be prejudiced.

### 2.    The Attkissons' Amended Complaint Was Not Futile Because The New ECPA Claim Against Verizon Alleged A Valid, Non-Frivolous Cause Of Action Consistent With Federal Rule Of Civil Procedure 8.

There is, of course, no reason to allow a complaint to be amended if the

newly amended complaint fails to allege a valid cause of action.  But here the

Amended Complaint added a claim against Verizon that was grounded in

numerous factual allegations.  These allegations, when examined together, lead to

the plausible inference that Verizon, in concert with the Government, illegally

participated in the surveillance of the Attkissons' electronic devices. The

Amended Complaint thus states sufficient facts to sustain a plausible ECPA claim

against Verizon.

As discussed above, Section 2511(1)(a) of the ECPA makes it unlawful to

"intentionally intercept[ ], endeavor[ ] to intercept, or procure[ ] any other person

to intercept or endeavor to intercept, any wire, oral, or electronic

communication . . . ." 18 U.S.C. § 2511(1)(a). To begin, there is no need to

address the procurer liability question, discussed in Section B above, with regard to

Verizon because Verizon and its employees are alleged to have directly infiltrated

the Attkissons' computer systems and conducted surveillance. Thus, even if this

Court rules that the ECPA provides no cause of action for procurer liability, the

ECPA claims against Verizon would still be operative.

In addition, the relevant facts in the Amended Complaint allege with

specificity Verizon's involvement with government surveillance of the Attkissons'

electronic devices. Verizon installed the Verizon FiOS system in the Attkissons'

home, and all the electronic devices that were illegally placed under surveillance

were on the Verizon network. JA535. Beginning in January 2012, Ms. Attkisson

contacted various Verizon representatives about ongoing problems resulting from

alleged surveillance efforts. JA536. Despite multiple attempts by Verizon

representatives to replace the router and the entire Verizon FiOS service box, the

Attkissons' electronic devices continued to experience strange issues. *Id.* The
Amended Complaint further alleges that, near the end of 2012, after Ms. Attkisson
reported to Verizon the existence of an extra fiber optics line protruding from her
FiOS service box, she received a visit from an individual who represented himself
to be a Verizon employee. JA542. Although Ms. Attkisson had specifically
requested that the extra fiber optics line be left at her home after removal, the line
vanished after the visit. *Id.* In addition, the purported Verizon technician could
not be reached by telephone after his or her visit to the Attkissons' home. JA542-
43.

Most important, the Amended Complaint sets forth the facts drawn from the
Biram deposition and subsequent forensic analysis, discussed above. JA547-50,
552-55. These factual allegations describe Verizon's ongoing relationship with
USPS, the Verizon IP addresses that were used to infiltrate the Attkissons'
systems, and the ongoing role Verizon played in enabling the intrusion. These
allegations are not naked legal conclusions devoid of factual support. To the
contrary, they are detailed factual assertions from which the Attkissons reasonably
infer Verizon's illegal participation in government surveillance of their electronic
devices. Moreover, the Amended Complaint does not simply contend that Verizon
took part in "unlawful" surveillance, but provides a set of detailed, specific, factual
allegations concerning precisely how the attack worked technically, the role that

59

Verizon's systems and personnel likely played, and Verizon's actions and inactions in relation to the Attkissons' electronic devices.

The factual allegations in the Amended Complaint therefore lead to reasonable inferences, considering the "entire course of events," *Tobey*, 706 F.3d at 386, that Verizon either "knowingly . . . accesse[d]" Ms. Attkisson's electronic devices or "knowingly cause[d] the transmission of . . . information" on her electronic devices.  18 U.S.C. § 1030(a)(4)-(5) (2012).  This Court in *Tobey* acknowledged that these inferences, while plausible, may turn out to be unfounded upon further discovery.  *Tobey*, 706 F.3d at 386.  But the standard of Rule 8 as well as the U.S. Supreme Court's rulings in *Twombly* and *Iqbal* do not require this Court to consider the merits of the Attkissons' claims.  Instead, the law only requires a determination of plausibility.

Because the Attkissons have supported the plausible inference that, based on numerous factual allegations, Verizon was knowingly involved in the surveillance of their electronic devices, they have sufficiently established a valid cause of action.  Thus, amending the Complaint to add Verizon as a defendant would surely not be futile.  And because courts should always err on the side of granting leave to amend a complaint, *Foman*, 371 U.S. at 182, the District Court's refusal to do so here is particularly egregious and constitutes an abuse of discretion.

**CONCLUSION AND REQUEST FOR RELIEF**

For the reasons described above, the District Court's dismissal of the Attkissons' claims under the Fourth Amendment and ECPA should be reversed, and this Court should remand the case to the District Court with instructions to permit the Attkissons to amend their Complaint and allow this matter to proceed to discovery.

**REQUEST FOR ORAL ARGUMENT**

Because of the importance of the issues raised in this appeal, including two legal questions raising issues of first impression in this Court, Appellants submit that oral argument is necessary and appropriate in this case.

Respectfully Submitted,

Professor Paul Schiff Berman
Walter S. Cox Professor of Law
The George Washington University Law School

Professor Paul Schiff Berman
9 Hesketh Street
Chevy Chase, MD. 20815
202.569.6837

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
### Effective 12/01/2016

No. __18-1677__        Caption: _Attkisson, et al. v. Holder, et al._____

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

---

**Type-Volume Limit for Briefs:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. <u>See</u> Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

---

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

---

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

---

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✓]   this brief or other document contains ____12,902____ [*state number of*] words

[ ]   this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✓]   this brief or other document has been prepared in a proportionally spaced typeface using
MS Word 2016_____ [*identify word processing program*] in
Times New Roman, 14 point_____ [*identify font size and type style*]; **or**

[ ]   this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) _Paul S. Berman_____

Party Name _appellants_____

Dated: _8/29/2018_____

# CERTIFICATE OF SERVICE

I certify that on  8/29/2018            the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

/s/ Paul S. Berman
———————————————                    ———————————————
Signature                                                         Date

8/29/2018