**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| SHARYL THOMPSON ATTKISSON, JAMES HOWARD ATTKISSON, SARAH JUDITH STARR ATTKISSON,<br><br>     Plaintiffs,<br><br>v.<br><br>SHAUN WESLEY BRIDGES, RYAN WHITE, and UNKNOWN NAMED AGENTS OF THE DEPARTMENT OF JUSTICE, in their individual capacities,<br><br>     Defendants. | Case No. 1:20-cv-68-RDB |

<u>**PLAINTIFFS' SECOND**</u>
<u>**AMENDED COMPLAINT**</u>

Plaintiffs, by and through undersigned counsel, submit the following Second Amended

Complaint pursuant to Court order.

<u>**INTRODUCTION**</u>

1.      This is an action against Defendants Shaun W. Bridges, Ryan White, and

Unknown Named Agents 1-50 of the Department of Justice[1], in their individual capacities, seeking compensatory damages under *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), for alleged violations of the Fourth Amendment to the United States Constitution, and alleged violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511.

### PARTIES

2.      Plaintiffs SHARYL THOMPSON ATTKISSON and JAMES HOWARD ATTKISSON are citizens and residents of 22697 Hillside Circle, Leesburg, Virginia.

3.      Plaintiff SARAH JUDITH STARR ATTKISSON is a citizen and resident of 43804 Central Station Drive, Ashburn, Virginia.

4.      Defendant SHAUN W. BRIDGES was a Special Agent with the United States Secret Service ("USSS") assigned to the Baltimore Silk Road Task Force. At all times relevant to the litigation, Defendant Bridges was a citizen and resident of 8411 Lillian Lane, Laurel, Maryland. Defendant Bridges is currently involuntarily incarcerated in Nashville, TN.

5.      Defendant RYAN WHITE is a citizen and resident of 725 Fallsway Drive, Baltimore, Maryland.

6.      At all times relevant to the subject lawsuit, Defendant BRIDGES and WHITE were agents and/or employees of the United States Government and conducted the unlawful surveillance and hacking of the computer systems of the Plaintiffs.

7.      Plaintiffs are unaware of the true names and capacities, whether individual or

---

[1]     The Court previously dismissed Defendants Rosenstein and Henry. See, Doc. 31-32.

otherwise, of the other Unknown Federal Agents and cannot learn them without discovery.

## JURISDICTION AND VENUE

8.      The subject litigation arises under the laws of the United States, and the Court has jurisdiction over the subject matter of this Complaint under 28 U.S.C. §§ 1331 & 1346(b).

9.      Venue is appropriate in Maryland because the Defendants' acts or omissions complained of (the illegal surveillance operation) occurred in Maryland in that all operational decisions were made in Maryland; all planning occurred in Maryland; the methods used for the operation were chosen and designed for the operation in Maryland; the U.S. Postal IP addresses used to implement the surveillance were accessed and used in Maryland; the equipment necessary to carry out the operation was acquired in and physically located in Maryland; the individuals necessary to the operation, including the Defendants, were located in Maryland; the operation was executed over the internet from Maryland using Maryland-based internet platforms, Maryland-based electricity; and Maryland-based services; the information acquired during the operation was acquired over the internet from Maryland, read in Maryland, disseminated from Maryland; decisions were made in Maryland; and the software was removed from the computer, or attempted to be removed, from Maryland. Although the computers that were attacked were physically located in a number of different states, including Virginia, the District of Columbia, Arizona, and others where Ms. Attkisson worked and traveled due to the mobile nature of the equipment and system, the surveillance operation was run from Maryland regardless of where Ms. Attkisson's computer

was physically located at any given time. *See* 28 U.S.C. § 1402(b).[2]

## FACTS APPLICABLE TO BOTH COUNTS

A.      **MS. ATTKISSON'S REPORTING AND THE INTRUSION**

10.      At all times relevant to the Complaint, the Plaintiff Sharyl Attkisson (hereinafter referred to as "Ms. Attkisson" or "Plaintiff Sharyl Attkisson") was an investigative news reporter at CBS News. She was employed at CBS for 20 years.

11.      In early 2011, Ms. Attkisson began reporting on the *Fast & Furious* initiative, under which the Bureau of Alcohol, Tobacco, and Firearms ("ATF") purposely allowed firearms dealers to sell marked weapons to straw buyers in anticipation that the weapons would later be sold to Mexican drug cartels.

12.      Ms. Attkisson's reporting of Fast *&* Furious was first aired by CBS on February 22, 2011. The report quoted and relied on confidential sources procured by Ms. Attkisson. Ms. Attkisson continued to report the story, which the Department of Justice initially denied, over the next several months.

13.      Ms. Attkisson's sources within ATF alerted her at the time that the agency was actively seeking to identify government insiders who were providing information or leaking to her

---

[2]      While there is no question that the surveillance operation had a direct impact on Plaintiffs' electronic devices when they were in the Virginia home, the factual evidence shows that the illegal activity originated from Maryland and impacted Plaintiffs electronic devices when she was in Virginia, the District of Columbia, Maryland, Arizona, Florida and even when she was overseas. Indeed, there is no allegation that surveillance was conducted of the physical house itself, at least to Plaintiff's knowledge. The Attkissons' various computer systems are mobile and connected to multiple networks in multiple jurisdictions, which obviously includes their home in Virginia. Thus, for venue purposes, the Plaintiffs contend that the relevant acts involve the place where the surveillance operation originated and from which it was executed.

and CBS.

14.     In October 2011, the government's Fast & Furious program came under renewed scrutiny when law enforcement officers found weapons distributed through the *Fast & Furious* program at several crime scenes, including the scene of the murder of a Border Patrol agent.

15.     In the fall of 2011, Ms. Attkisson began to notice anomalies in her electronic devices, including her laptop computer, her mobile BlackBerry device, the computer station at her home where she conducted part of her work, and even the electronic house alarm. These anomalies occurred wherever she was physically located so long as she was on the internet or had access to the internet. At her home, all the affected devices were connected to the internet via Verizon's fiber optic service, FiOS.

16.     On multiple occasions, including in February 2012, Ms. Attkisson contacted Verizon to complain about continuing anomalies.

17.     In March 2012, a Verizon representative visited Ms. Attkisson's home and replaced the router a second time. The representative also replaced the entire outside FiOS service box. Despite Verizon's efforts, however, the anomalies persisted.

18.     In April-May 2012, the DOJ and FBI publicly announced a new effort to vastly expand cyber related efforts to address alleged national security-related cyber issues. During the same time frame, the DOJ secretly seized personal and phone records belonging to journalists from the Associated Press news agency in violation of longstanding DOJ practice. The records seizure was not publicly known at the time, but was later revealed.

19.     In July 2012 it was reported that the DOJ designated the U.S. Attorneys' offices

to act as "force multipliers" in its stepped-up cyber efforts in the name of national security.

20.     On October 5, 2012, CBS aired Ms. Attkisson's first Benghazi story for CBS, which was critical of the Executive Branch's handling of the security requests at the U.S. compound in Benghazi, Libya, where Ambassador Christopher Stevens and three (3) other U.S. personnel were killed on September 11, 2012.

21.     On October 8, 2012, CBS aired another Attkisson report on Benghazi that included an interview with whistleblower Col. Andrew Wood. During the weeks following the airing of Col. Wood's interview, Ms. Attkisson made personal contact with numerous confidential sources within the federal government (or who had links to intelligence agencies within the U.S. government). The confidential government sources reported to Ms. Attkisson that efforts were being made by the Executive Branch to clamp down on leaks and to track the leaking of information to specific reporters regarding the Benghazi affair.

22.     During the same time period, October of 2012, the DOJ continued its stepped-up cyber efforts with its National Security Division providing specialized training at DOJ headquarters for the National Security Cyber Specialists (NSCS) network and the Criminal Division's Computer Crime and Intellectual Property Section (CCIPS).

23.     In the latter part of October 2012, each of the Plaintiffs began noticing an escalation of electronic problems, including interference in computer and mobile phone lines, computer interference, and television interference. They were still unaware of any intrusion, however.

24.     During the same general time frame, several sources with close ties to the

intelligence community approached Ms. Attkisson privately and informed her that the government would likely be monitoring her electronically in an effort to identify her confidential sources, and also to monitor her continued investigative reporting on the *Fast & Furious* and *Benghazi* stories.

25.     In September 2012, WikiLeaks published internal emails acquired from a global intelligence company doing business with government agencies. The materials referenced "Obama leak investigations" and the alleged "witch hunts of investigative journalists learning information from inside the beltway sources." The email stated, "(T)here is a specific tasker from the [White House] to go after anyone printing materials negative to the Obama agenda (oh my.) Even the FBI is shocked." [3]

26.     From November 7-9, 2012, Attorney General Holder hosted a national training conference at DOJ headquarters for the expanded efforts of DOJ's National Security Cyber Specialists (NSCS). [4]

27.     On November 13, 2012, the F.B.I. initiated a body of cyber security case investigations that would later relate to the illegal intrusions directed at Ms. Attkisson.

28.     In November 2012, Ms. Attkisson's mobile phones experienced regular interruptions and interference, making telephone communications unreliable, and, at times, virtually impossible.

29.     In December 2012, Ms. Attkisson discussed her phone and computer issues with

---

[3]     http://www.wikileaks.org/gifiles/docs/1210665_obama-leak-investigations-internal-use-only-pls-do-not.html (last accessed on October 28, 2014).
[4]     https://www.justice.gov/archives/opa/blog/new-network-takes-aim-cyber-threats-national-security

friends, contacts, and sources, via her home phone, mobile phones, and email. She decided to begin logging the times and dates that the computers turned on at night without her input. Soon after these phone and email discussions, the computer nighttime activity stopped.

## B.    THE INTRUSION IS DETECTED

30.    In December 2012, a colleague and friend with U.S. government intelligence experience was consulted. During the course of his inspection of the Plaintiffs' electronic system and equipment, the consultant discovered an anomaly with Ms. Attkisson's FiOS (Verizon) box: an extra fiber optics line that was dangling from the exterior of the box. Based on the odd finding, Ms. Attkisson was instructed to contact Verizon. On December 31, 2012, Verizon verbally denied that it had installed or had knowledge of the extraneous fiber optics line affixed to the equipment and suggested that the Plaintiffs contact law enforcement authorities. Shortly thereafter, a person identifying herself as a Verizon supervisor telephoned Ms. Attkisson to advise her that Verizon would be dispatching a technician to the house the following day, which was New Year's Day. Ms. Attkisson informed the purported supervisor that it was unnecessary to dispatch a technician on New Year's Day, and she offered to send them a photograph of the stray fiber optics line to save Verizon the trip. The purported supervisor declined the photograph and insisted that a technician would be present on New Year's Day.

31.    On January 1, 2013, a person represented to be a Verizon technician visited the Attkisson's home and removed the additional fiber optics cable from the system. Ms. Attkisson asked the technician to leave the cable. The technician placed it next to the equipment and left the home. When Ms. Attkisson's husband later arrived home and went to retrieve the extraneous

cable for expert examination, the cable had been removed and was no longer on the premises.

32.     Throughout the month of January, 2013, Ms. Attkisson repeatedly contacted the purported Verizon technician to seek the location of the missing cable. The person representing himself as a technician never returned any of the calls at the number that he had provided.

33.     Plaintiffs continued to experience phone and internet usage issues, including drop-offs, noises, and other interference. Verizon was  notified and technicians and supervisors made additional contacts and  visits.

34.     On January 8, 2013, Ms. Attkisson made arrangements to deliver her work-related Toshiba laptop to an individual with special expertise in computer forensics and covert government operations.

35.     On January 9, 2013, the forensics expert reported to Ms. Attkisson  that the Toshiba laptop showed clear evidence of outside and unauthorized "intrusion," and that the sources of the intrusions were U.S. government in nature, due to the sophisticated nature of the technology used.

36.     On January 10, 2013, the computer was returned to Ms. Attkisson, along with a report. According to the report, the forensics computer expert found that sophisticated  software had been used to accomplish the intrusions, and the software fingerprint indicated the software was proprietary to the federal government.  The intrusions included,  among other surveillance, keystroke monitoring,  exfiltration of data, audio  surveillance of Plaintiffs' conversations and activities at home by activating Skype, mining personal passwords, monitoring work and personal email, and probable compromise of Plaintiffs' work and personal smartphones. According to the

report, this stage of surveillance conducted using the identified software spanned most of 2012 at least. The report also stated the intruders had accessed CBS's network systems as well, such as the ENPS program, and that the perpetrator(s) had also placed three classified documents deep inside the computer's operating system. Ms. Attkisson thereafter notified her direct supervisor at CBS News in Washington of the laptop intrusion and findings.

37.    On February 2, 2013, an independent forensic computer analyst retained by CBS News spent approximately six (6) hours at Ms. Attkisson's home, during which time he reported finding evidence on both Ms. Attkisson's Toshiba laptop and Apple desktop computers of a coordinated, highly-skilled series of actions and attacks directed at the operation of the computers and the storage and access of data thereon. CBS engaged the company to do further analysis of the Toshiba laptop in an attempt to recover wiped data.

38.    In March 2013, Ms. Attkisson's Apple desktop computer began malfunctioning and, after several days of it freezing and emitting a burning odor, it shut down. Ms. Attkisson was unable to turn the Apple computer back on after this event.

39.    On April 3, 2013, Ms. Attkisson filed a complaint with the DOJ Inspector General.

40.    On May 6, 2013, an official with the United States Department of Justice Inspector General's office called Ms. Attkisson and stated that he had checked with the FBI, and the FBI denied any knowledge of any operations concerning Ms. Attkisson's computers or phone lines. The official also stated that there was no PATRIOT Act related order authorizing surveillance of Ms. Attkisson.

41.    On May 21, 2013, Ms. Attkisson publicly stated in a radio interview her belief

that her computers had been compromised, but did not assign or allege responsibility. A news outlet sought a statement from the DOJ regarding Ms. Attkisson's assertions. The DOJ issued a written response stating, "To our knowledge, the Justice Department has never compromised Ms. Attkisson's computers, or otherwise sought any information from or concerning any telephone, computer or other media device she may own or use."

42.     On June 10, 2013, the independent cyber security firm hired by CBS confirmed that there was a highly sophisticated intrusion into Ms. Attkisson's Toshiba work computer, as well as remote intrusions in December, 2012, to try to delete all evidence of the intrusions.

43.     On June 11, 2013, CBS News issued a public statement, based on the forensics report, confirming that Ms. Attkisson's computer was accessed by an unauthorized, external, unknown party on multiple occasions in late 2012, and that the party used sophisticated methods to attempt to remove all possible indications of unauthorized activity.

44.     The DOJ Inspector General requested a copy of the CBS forensic expert's report and requested the opportunity to examine the CBS Toshiba computer. CBS denied the requests. Ms. Attkisson then retained an independent computer forensics expert to conduct further analysis of the Toshiba computer, as well as her other electronic devices.

45.     In September, 2013, while Ms. Attkisson continued working on the *Benghazi* story at her home in the evening, she observed for the first time that a third computer, her personal MacBook Air, was accessed remotely and briefly controlled while she was using it to work on a story related to the *Benghazi* case.

46.     In June of 2013, though Plaintiffs were unaware at the time, the FBI had begun

conducting inquiries of Ms. Attkisson's computer intrusions, listing her as the "victim," but the agency failed to contact or interview Plaintiffs. Ms. Attkisson only discovered the FBI inquiry in December, 2013, when she appealed denial of her Freedom of Information Act request to the FBI and received some documents.[5]

47.     The FBI investigation involving Ms. Attkisson's computer intrusions was circulated to the DOJ's national cyber security group and was included with a set of cases opened in November, 2012, during the DOJ's expansion of its cyber team and the announcement of its intention to use "new tools" in its arsenal.

48.     Although CBS did not release the compromised CBS computer to the DOJ Inspector General, in January, 2014, Ms. Attkisson asked the Inspector General to examine her personal Apple desktop computer.

49.     On January 16, 2014, and January 27, 2014, the head of the DOJ Inspector General Computer Forensics unit and a colleague visited Ms. Attkisson's home as part of the investigation, which included analysis of the family's Apple desktop but not the primary computer involved: the CBS Toshiba laptop.

50.     During the investigation, the DOJ Inspector General investigators remarked to Ms. Attkisson that they saw a great deal of suspicious activity on the Apple computer. However, as months went by, the investigators told Ms. Attkisson that the scope of their investigation had been narrowed by an unnamed party. The investigators also indicated the DOJ Inspector General Counsel's office had entered the picture and would decide whether Ms. Attkisson could see the

---

[5]     Ms. Attkisson was unaware of the F.B.I. case at the time it was opened and for months thereafter.

report or any information about her computer.

51.     The DOJ Inspector General ultimately refused to release the final written report to Ms. Attkisson. The DOJ Inspector General also failed to properly respond to Ms. Attkisson's subsequent Freedom of Information Act requests on the topic. The DOJ Inspector General finally released only a summary upon Congressional request on the eve of Ms. Attkisson's testimony to a Senate panel in early 2015.

52.     Although the DOJ Inspector General summary noted a great deal of advanced mode computer activity not attributable to Ms. Attkisson or anybody in her household, the report nonetheless concluded, paradoxically, that it found no evidence of intrusion into her personal Apple computer. Government officials then provided the summary to the press and falsely implied that government examiners had ruled out intrusions into Plaintiff's computers. The DOJ Inspector General did <u>not</u> examine the compromised CBS laptop computer or any other devices and did not include them in its report.

53.     Among other findings, Ms. Attkisson's computer forensics experts have identified multiple unauthorized communications channels opened into her Toshiba laptop directly connected to Internet Provider (IP) addresses belonging to a federal government agency, specifically the United States Postal Service, indicating unauthorized surveillance whose source is the federal government.[6]

---

[6]     Significantly, in a deposition of the United States Postal Service representative, Cliff Biram, Mr. Biram admitted that the IP addresses found on Ms. Attkisson's work laptop were in fact owned and controlled by the USPS; that the IP addresses were never authorized to be used and that use of the IP addresses was illegal; and that the IP addresses were both private, non-published,

54.     The analysis showed the connection to a federal government agency was in use prior to January 8, 2013. The USPS has been publicly reported, including in IG internal audits, to have a working relationship with the FBI, Department of Homeland Security, and DOJ for domestic surveillance projects.   In addition, the multi-agency task force in Maryland that conducted surveillance of the Attkissons' computer systems used USPS IP addresses on other occasions to conduct operations.

55.     The forensic analysis likewise proved that in July 2012, the intruders remotely "refreshed" the ongoing surveillance of Ms. Attkisson's computer.

56.     Ms. Attkisson's analysts also found that although the government source who first analyzed her CBS Toshiba laptop in January, 2013, wiped evidence, he or she likely copied and retained the evidence on an external hard drive.

57.     Ms. Attkisson's analysts also found that direct evidence pointing to attribution for Ms. Attkisson's computer intrusions likely also reside on the CBS network computer systems.

58.     Ms. Attkisson recently sought to retrieve additional forensic information from the Baltimore-based cybersecurity firm that CBS originally hired to conduct forensics on Ms. Attkisson's CBS computers. CBS had provided written assurances that it would preserve all such material. However, that firm, CyberPoint, informed Ms. Attkisson that it had destroyed the material.

**C.     THE PLAINTIFFS TAKE LEGAL ACTION**

---

addresses which were not connected to the internet. The latter fact means that only government authorized users could possibly have accessed and used the IP addresses.

59.     Faced with a mountain of forensic evidence proving an illegal intrusion, and a recalcitrant and evasive government response to repeated inquiries, on December 26, 2014, Plaintiffs submitted an Administrative Tort Claim to the United States Department of Justice and the United States Postal Service as required by law. Plaintiffs' claim was deemed denied by virtue of Claimants/Plaintiffs receiving no response from the respective federal agencies within six months of filing, pursuant to 28 U.S.C. § 2675(a).

60.     On December 30, 2014, Plaintiffs brought a *Bivens* action under the First and Fourth Amendments (along with other counts) against named and unnamed federal defendants in the Superior Court for the District of Columbia. The government removed the case to the U.S. District Court of the District of Columbia.

61.     Within two months of first filing suit, the Plaintiffs sought leave of the court to serve limited, immediate discovery to determine the true identities of the Doe Defendants. The Plaintiffs alleged that "good cause" existed to afford such discovery because they could not further prosecute their action until they identified the Doe Defendants.

62.     The litigation was ultimately transferred to Virginia where it was then dismissed. The dismissal was affirmed by the Fourth Circuit Court of Appeals.

**D.     A PARTICIPANT IN THE INTRUSION COMES FORWARD**

63.     Following the Fourth Circuit's opinion, a former government actor (Ryan White) came forward for the first time and revealed that he personally participated in the illegal operation aimed at Ms. Attkisson and her family.

64.     During all relevant times, Defendant WHITE worked as an undercover informant

for the Department of Justice and as a contractor operating out of the Baltimore Field Office under a group supervised by Rod Rosenstein. In this capacity, Defendant WHITE conducted work for the FBI, United States Secret Service, Drug Enforcement Administration, and the Bureau of Alcohol Tobacco and Firearms.

65.      Between 2012 and 2014, Defendant BRIDGES was a Special Agent with the U.S. Secret Service and assigned to the Baltimore Silk Road Task Force, a multi-agency group investigating illegal activity on the Silk Road, a covert online marketplace for illicit goods, including drugs. In 2015 and 2017, Defendant BRIDGES was convicted of crimes that related to his government work, and is now serving a prison sentence in Nashville.[7]

66.      When Defendant WHITE voluntarily came forward he admitted to Plaintiffs' representatives that he worked out of the Baltimore Field Office during the relevant time period; admitted that Rod Rosenstein supervised and controlled the activities of the Silk Road Task Force, along with both he and Defendant BRIDGES; admitted that he and Defendant BRIDGES worked together with others to conduct the illegal surveillance complained of herein; and admitted that the Plaintiffs' computer system was illegally accessed using U.S. Government resources; and admitted that the illegal activities were planned, conducted, and implemented from Maryland.

67.      Defendant WHITE further admitted that Defendant BRIDGES was tasked with surveillance of the "*Fast and Furious*" project, even prior to Plaintiff Attkisson's involvement, and that Defendant BRIDGES reported to Shawn Henry of the FBI.

68.      Defendant WHITE also reported that Mr. Henry was a computer expert, and that

---

[7]      https://www.justice.gov/opa/pr/former-secret-service-agent-sentenced-scheme-related-silk-road-investigation

he and the people working with and for him, including Defendant BRIDGES, used software programs developed for the specific purpose of conducting illegal surveillance.

69.     Defendant WHITE also reported that between 2011 and 2015, he worked directly with the people responsible for violating Plaintiffs' rights, including Defendant BRIDGES, and described how Defendant BRIDGES informed him that the work assignment was on the "dirty side" and was one that "they did not want to get public". The "they" in Defendant WHITE's reference was described by him as "DOJ, the FBI, and the intelligence community".

70.     Defendant WHITE also very clearly reported that his group was ordered to commit illegal surveillance of Ms. Attkisson, her family, her co-workers, and the local team running the "*Fast and Furious*" program in Arizona. Although Defendant WHITE made clear that others were involved in the illegal surveillance, it was primarily DEFENDANT Bridges who was tasked with "hacking and violating computer systems" because that was his specialty for the Government and the Secret Service.

71.     Defendant WHITE likewise reported that he was personally present with Defendant BRIDGES on "many occasions" when they were "accessing Attkisson's computers" and "retrieving information already accessed or manipulated" and "erasing information" or "passing the information on" to contacts at the DOJ and FBI.

72.     Defendant WHITE likewise verified that "much of the illegal work was done through the Criminal Division's Computer Crime and Intellectual Property Section in Baltimore" before it came "online".

73.     Defendant WHITE reported that the equipment used in the illegal surveillance was

either purchased from pawn shops for cash or were laptops removed from the Secret Service in Maryland, used for the surveillance, and then returned to be wiped and re-used by Defendant BRIDGES and others in Maryland.

74.     Defendant WHITE likewise explained how Defendant BRIDGES would provide him with detailed descriptions of the illegal surveillance programs and methods being used on Plaintiffs and would even show him the methods used to hide and conceal traceability.

75.     Defendant WHITE reported that Defendant BRIDGES was specifically told to "target Ms. Attkisson's husband" and "to get that b---h under control", and that these directives came directly from Rod Rosenstein who had reportedly received them directly from Attorney General Eric Holder.

76.     Defendant WHITE confirmed that he personally witnessed the successful illegal invasion of Plaintiffs' computer systems and the "planting of access points" as well.

77.     Defendant WHITE reported that he was personally present during the illegal surveillance and personally participated.

78.     Defendant WHITE reported that particular emphasis was placed on security of this operation because of the publicity the Plaintiff, Sharyl Attkisson, was bringing to "Fast and Furious" and that people were worried about the "blowback" that would follow.

79.     Defendant WHITE reported that later an order came down to remove the government's illegal software because Defendant Attkisson had "tied the FBI and White House" and was getting too close to the situation.

80.     At times relevant to the Complaint, Plaintiff Attkisson was a member of the press.

81.     On January 10, 2020, Plaintiffs Sharyl Thompson Attkisson, James Howard Attkisson, and Sarah Judith Starr Attkisson (collectively "Plaintiffs" or the "Attkissons") filed suit against Defendants Rod Rosenstein, Shawn Henry, Sean Wesley Bridges, Robert Clarke, Ryan White, and Unknown Named Agents 1-50 of the Department of Justice, in their individual capacities. (*See* ECF No. 1.)

82.     The above-cited events, which offer only brief highlights of the cyber-attacks suffered in Plaintiffs' home, caused Plaintiffs to incur unreasonable and unnecessary expenses in an effort to diagnose and correct the problems resulting from the attacks and intrusions; resulted in an invasion of their personal and family privacy; caused them to fear for their individual and family's well-being and safety; interfered with their ability to use their telephones, computer, and television; caused them fear for her sources' well-being and safety; interfered with Plaintiffs' ability to maintain necessary contacts with sources to perform her professional investigative reporting duties as a member of the press; affected Plaintiffs' sources' willingness to communicate with her; distracted from her duties as an investigative reporter; and resulted in irreparable tension in her relationship with her employer.

83.     The actions of Defendants as described above, including the government intrusions, negligently, recklessly, and intentionally caused Plaintiffs' rights to privacy to be violated, and trespassed upon Plaintiffs' real and personal property as alleged herein, without probable cause or any other legal justification, and as a result, Plaintiffs suffered damages.

84.     At all times relevant to the subject Complaint, the Defendants acted with reckless and callous indifference to the rights of Plaintiffs with the intent to subject them to, or cause them

to be subjected to, statutory violations of the ECPA.

85.     It is worth noting that during the time period of the events alleged in this Complaint, former NSA representatives who previously left in protest of the mass privacy violations alleged to be occurring within the agency, came forward and spoke publicly confirming that Government personnel were targeting journalists using surveillance techniques unique to the Government, confirming that the DOJ and the agencies operating under it were targeting journalists as part of the paranoia surrounding alleged leakers using unique and state-sponsored technology.

86.     Although the Director of National Intelligence, James Clapper, testified before the Senate Intelligence Committee in March, 2013, denying the existence of illegal surveillance and data collection of millions of Americans, whistleblower Edward Snowden's revelations in June, 2013, proved Clapper's testimony was false. Facing accusations of perjury from members of Congress, Mr. Clapper sent a letter to the committee chairwoman, Sen. Dianne Feinstein, in July, 2013, apologizing for his "clearly erroneous" remarks made under oath about the secret surveillance and data collection projects being undertaken.

87.     Yet more former Government employees continued to come forward providing further support for the existence of such "black ops" programs targeting citizens like Plaintiffs. For instance, Russell Tice, who spent nearly 20 years working in various government agencies, including the Office of Naval Intelligence, Defense Intelligence Agency, and NSA, publicly stepped forward with alleged firsthand knowledge of the targeting of journalists for surveillance. Speaking on television in 2009, Mr. Tice confirmed that while serving as an analyst at the NSA,

he personally witnessed an agency program that gathered information on U.S. news organizations and journalists.

88.     In addition to the foregoing, and with regard to technological capabilities of the DOJ, NSA, White House, CIA and other government agencies to conduct remote access surveillance of computer systems, in August, 2013, the German magazine *Der Spiegel* reported that it reviewed NSA documents, which had been provided by Mr. Snowden, that provided clear evidence that the agency hacked into a "specially protected" internal communication system at the Qatar-based broadcaster Al-Jazeera, in almost an identical manner as with Plaintiffs intrusion. According to *Der Spiegel*, the NSA documents listed the operation as "a notable success."

89.     One of the most striking recent revelations about the DOJ's pursuit of the media was the disclosure that the DOJ had, during relevant time frames, obtained e-mails from the Google account of James Rosen of Fox News, in which he corresponded with a State Department analyst suspected of leaking classified information about North Korea. Investigators routinely search the e-mails of suspected leakers, but Congress has specifically forbidden the searching of journalists' work product materials unless the reporter was alleged to have committed a crime and without due process of law.

90.     In December of 2019, the Department of Justice Inspector General found that three teams of handpicked FBI officials had committed egregious errors and misconduct concerning surveillance of U.S. citizens. This included an FBI attorney doctoring  documentation; and FBI officials failing to submit the required "Woods file" documentation to support factual claims justifying a secret wiretap; improperly withholding exculpatory information; and relying on

material that they knew to be unreliable.[8]

COUNT 1
**CAUSE OF ACTION**
VIOLATION OF THE **FOURTH**
AMENDMENT TO THE CONSTITUTION

91.     Plaintiffs incorporate and re-allege each and every allegation above as if fully set forth herein.

92.     This action arises under Bivens.

93.     At all times relevant to the subject Complaint, Defendants acted under color of law when conducting the illegal surveillance of the Plaintiffs.

94.     The surveillance of the Plaintiffs' electronic devices violated the Fourth Amendment to the United States Constitution. The Plaintiffs' right to be secure in their person, residence, papers, and effects against unreasonable searches and seizures was violated. The Plaintiffs had a reasonable expectation of privacy with respect to their electronic devices, and the Defendants had no warrant authorizing the surveillance, nor did any exigent circumstances exist at the time of such surveillance.

95.     The violation of the Plaintiffs' Fourth Amendment rights proximately caused their injuries, as set forth herein.

96.     The Defendants' acted with reckless and callous indifference to the federally protected rights of the Plaintiffs.

97.     By virtue of the foregoing, the Defendants are liable to Plaintiffs for their violation of the Plaintiffs' rights under the Fourth Amendment.

**COUNT II**

---

[8] https://www.justice.gov/storage/120919-examination.pdf

**CAUSE OF ACTION**
**VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**U.S.C. §§ 2511 & 2520**

98.      Plaintiffs incorporate and re-allege each and every allegation above as if fully set forth herein.

99.      The Defendants, individually and in concert, personally intercepted or endeavored to intercept the Plaintiffs' wire, oral, or electronic communications in violation of the law and accepted precedent.

100.      The Defendants, individually and in concert, personally used, endeavored to use an electronic, mechanical, or other device to intercept Plaintiffs' oral communications.  Such device or devices were affixed to or transmitted a signal through a wire used in wire communications, and was for the purpose of obtaining information relating to business which affects interstate commerce.  All, or at least virtually all, of such conduct was planned, initiated, conducted, and occurred in the District of Maryland.

101.      The Defendants, individually and in concert, personally disclosed or endeavored to disclose the contents of Plaintiffs' wire, oral or electronic communications, knowing or having reason to know that the information was obtained through the interception of a wire, oral or electronic communications.

102.      According to Defendant WHITE's own admissions, the above alleged conduct occurred with direct authorization of high-level government officials, including Mr. Rosenstein and Mr. Holder, and without authorization from a court of competent jurisdiction.

103.      As a direct and proximate result of the aforesaid conduct, Plaintiffs have suffered damages as set forth herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request judgment in their favor against Defendants, jointly and severally, for compensatory and punitive damages in an amount to be proven at trial; for an injunction prohibiting the Defendants, and all other agents of the federal government, from conducting surveillance of any sort against Ms. Attkisson without first obtaining a warrant in compliance with the law; for a Declaration that Defendants' actions, practices, customs, and policies regarding the unauthorized surveillance of the Plaintiffs were unjustified, illegal, and violated Plaintiffs' statutory rights; for attorney's fees and costs; and for such other and further relief as the Court may deem just and appropriate.

**TRIAL BY JURY IS DEMANDED.**

Respectfully Submitted,

SHARYL THOMPSON ATTKISSON
JAMES HOWARD ATTKISSON
SARAH JUDITH STARR ATTKISSON
By counsel

/s/ C. TAB TURNER
C. Tab Turner, Esq. (*Pro Hac Vice*)
***TURNER & ASSOCIATES, P.A.***
4705 Somers Avenue, Suite 100
North Little Rock, Arkansas 72116
501-791-2277 – Office
501-791-1251 – Facsimile

*Tab@tturner.com*

David Muncy
**PLAXEN & ADLER, P.A.**
10211 Wincopin Circle, Suite 620
Columbia, MD 21044
Phone: 410-413-7528
Fax: 410-730-1615
dmuncy@plaxenadler.com

Paul Schiff Berman (*Pro Hac Vice*)
Attorney at Law
9 Hesketh St.
Chevy Chase, MD. 20815
202-569-6837 - Phone
*pberman@law.gwu.edu*

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on April 5, 2021, I electronically filed the foregoing with the Clerk
of the Court using the CM/ECF system, which will send notification of such filing (NEF) to the
following counsel of record:

Andrew Han, Esq.
Dennis Carl Barghaan, Jr., Esq.
Lauren A. Wetzler, Esq.
Office of the United States Attorney
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, VA 22314

Tel: 703-299-3970
Fax: 703-299-3983
Andrew.han@usdoj.gov
Dennis.barghaan@usdoj.gov
Lauren.wetzler@usdoj.gov
*Counsel for Defendants*

/s/    C. TAB TURNER
C. Tab Turner, Esq. (*Pro Hac Vice*)
***TURNER & ASSOCIATES,  P.A.***
4705 Somers Avenue, Suite 100
North Little Rock, Arkansas 72116
501-791-2277 – Office
501-791-1251 – Facsimile
*Tab@tturner.com*